526 So.2d 433 (1988)
Linda AMEDEE, as the Natural Tutrix of her minor child, Ronique Amedee
v.
Rose and Iley CRUSE.
No. CA-8784.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1988.
Clyde A. Ramirez, Ivan David Warner, III, Patricia D. Miskewicz, Pamela P. Rask, New Orleans, for plaintiff-appellee.
Ronald L. Ronzello, Metairie, for defendant-appellant.
Before SCHOTT, BARRY, KLEES, CIACCIO and PLOTKIN, JJ.
PLOTKIN, Judge.
The owners of an apartment building appeal a $75,000 award for injuries resulting from a fall down stairs with an allegedly defective railing. The only issue is whether the award is excessive.
Ever mindful of the Louisiana Supreme Court's admonition to appeals courts to give great discretion to the factfinder's determination of the appropriate amount of damage awards, Meyers v. Imperial Cas. Ind. Co., 451 So.2d 649, 653 (La.App. 3d Cir.1984), we reduce the award in the instant case to $30,000. A review of the specific facts and circumstances in this case reveals that the jury's $75,000 award was a clear abuse of discretion.
The standard for appellate review of the amount of a damage award was set out as follows in Reck v. Stevens, 373 So.2d 498, 501 (La.1979):
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
This standard was most recently reaffirmed by the Louisiana Supreme Court in Joseph v. Ford Motor Co., 509 So.2d 1, 2 (La.1987) and by this court in Soulier v. Highlands Ins. Co., 517 So.2d 355, 358 (La.App. 5th Cir.1987).
The Supreme Court has established that an appellate court should not disturb a trial court determination as to quantum unless the record in the case reveals that the trial court abused its "much discretion" in fixing damages. Bitoun v. Landry, 302 So.2d 278, 279 (La.1974). In determining *434 whether an abuse of discretion has occurred, the following rule applies:
The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it.
Id.
A following review of the record in the instant case reveals that the evidence plus the justifiable inferences from the evidence simply do not support the $75,000 jury verdict.
On January 17, 1985, the plaintiff's daughter, Ronique, a 14-year-old girl, slipped and fell on the steps of the apartment building owned by defendants where she lived. Immediately following the fall, she went to school. She did not seek medical attention until January 25, 1985, some eight days after the fall, when she went to St. Mary's Clinic, where she was examined by Dr. Kirby Green, an internist.
Dr. Green testified that during his examination, he discovered a number of soft tissue injuries to Ronique's breasts, thorax and knees. The photographs of the bruises indicated that they were inconsequential. His suggested treatment included a tight bra, warm compresses, physical therapy treatments and prescription medicine to relieve some of the muscle soreness. He also recommended a pregnancy test and chest x-rays. Dr. Green testified that he found no evidence of neurological deficit caused by the injury. No possible psychological problems were mentioned at that time.
Ronique was admitted to United Medical Center of New Orleans on January 31, 1985, where she underwent chest x-rays and a CAT scan of the lumbar spine, both of which were normal. She was discharged on February 5, 1985. The discharge summary on the hospital records indicates that the patient suffered acute lumbar strain and anemia. Dr. Green testified specifically that there were no broken bones and no disc injuries. The hospital records indicate that Ronique returned for thirteen physical therapy treatments between February 5 and April 2, 1985 and three office examinations between February 5 and March 14, 1985. The testimony at trial does not indicate the reason for or result of the office visits. Again, no reference to any emotional problems were suggested.
Subsequently, Ronique was examined by Dr. Thomas S. Whitecloud, III, an orthopedic surgery specialist, on May 14, 1985. He did not testify at trial, but his deposition was introduced into the record. Dr. Whitecloud said that Ronique was lethargic and uncooperative, and that he could find nothing wrong with her other than a possible motor weakness in the lower back. He stated that although he felt there was nothing wrong, he ordered a lumbar myelogram because he wanted to rule out serious organic problems. He said that he felt Ronique was overreacting and that she seemed "spaced out."
Ronique was admitted to Tulane Medical Center on May 15, 1985, where she underwent the myelogram and a urological exam. The tests were normal, ruling out any serious organic cause for her alleged leg numbness and loss of urinary control. She was discharged May 17. Dr. Whitecloud stated that the myelogram procedure is not "particularly painful."
Dr. Whitecloud saw Ronique again on May 24, when she told him that she felt worse. He stated that he felt Ronique's problems were psychological. He prescribed some pain killers because she complained of pain when he examined her lower back. Dr. Whitecloud examined Ronique a third time on October 8, 1985. He stated that she seemed better on that occasion, but that she complained of back and bilateral leg and anterior thigh pain. Finally, Dr. Whitecloud stated that he feels nothing was physically wrong with Ronique the very first time he saw her, that she was probably merely suffering a conversion reaction.
Considering all the medical evidence presented at trial, it is obvious that Ronique's physical injuries resulting from the fall were limited to minor soft tissue injuries, the effect of which possibly lasted through October 8, 1985 at the most. She certainly exhibited no evidence of physical *435 injuries when she was first examined by Dr. Whitecloud on May 14, 1985, some four months after the fall.
Regarding Ronique's alleged psychological problems, which the plaintiff claims were occasioned by the fall, the only psychiatric evidence presented at trial was the testimony of Dr. Ralph Chester, a child psychiatrist. He testified that he first saw Ronique in June of 1986, some year and one-half subsequent to the fall. Dr. Chester diagnosed Ronique's mental or emotional state as follows: "Adjustment disorder with mixed emotional features with depression and anxiety."
Dr. Chester's testimony indicated that he felt there were mixed causes for Ronique's psychological problems. Besides the fall, Dr. Chester opined that the divorce of Ronique's parents and the death of Ronique's grandmother had contributed to her difficulties. His testimony indicated some uncertainty concerning the cause of Ronique's problems. When questioned by the plaintiff's attorney, he stated as follows:
Q Doctor, you stated in the history that you took from her you knew about the fall Ronique had in 1985.
A Yes.
Q Do you feel the problems you have been treating her for are related in any way to the fall?
A Yes, I think they are.
Trial transcript, page 23.
Then, when questioned by the defendant's attorney, Dr. Chester made the following statements:
Q In Ronique's situation she had some problems in her life other than the alleged accident, isn't that right?
A Yes.
Q What was that?
A The family had sustained the death of at least one member. I don't remember now.
Q That's the grandmother.
A Yes, sir, the grandmother or grandfather, and Ronique had some closeness to that person, was grieving that person's death. There had also been, I think, a divorce in the family, her mother and father had undergone.
Q What effect would the death of the grandmother and separation of the parents have on the fourteen year old going through puberty?
A It makes most children and teenagers sad, they grieve over that.
Q Do they become degressed?
A No. They may feel depression. A lot of people that incur deaths of loved ones don't become clinically depressed, and an anti-depressant may be prescribed to help bring them out.
Q Did she feel depressed about it?
A She said she was sad, didn't tell me much about that.
Q She was sad her parents had separated?
A Yes.
Q Do you think, Doctor, that played a major part in Ronique Amedee's anxiety and depression and apathy that her parents had separated and that her grandmother had died?
A I think it played a part. I think it played a major part. Again, this happens to many people and they don't become disabled.
Trial transcript, pages 30-31.
Therefore, Dr. Chester's testimony was equivocal concerning the role the accident played in bringing on Ronique's depression and other psychological problems. His testimony was also uncertain concerning whether the year and one-half delay between the time of the fall and the time Ronique initially sought psychological treatment had any effect on the success of the treatment. He did indicate that Ronique would need about one year of therapy before her problems could be worked through.
After the initial consultation and some follow-up with Dr. Chester, Ronique was referred to one of Dr. Chester's female collegues who specializes in treating adolescents. She saw that counselor weekly for a while. In August of 1986, Dr. Chester prescribed some anti-depressant drugs, and he consulted with her prior to trial *436 concerning some the side effects from the drug. Unquestionably, the plaintiff is entitled to some recovery for the mental distress which she sustained which is attributable to the fall.
Dr. Chester indicated that Ronique would need an additional year of therapy. The jury interrogatory indicates that the jury did not give any special damages for the cost of future psychiatric treatment. The evidence indicates that the plaintiff is entitled to some recovery for future care. Dr. Chester stated that the usual fee for a child psychiatrist in this community is between $90 and $130 for 15 minutes, which is unreasonable. There was no other estimate of cost of future psychiatric treatment, and Dr. Chester did not indicate how often Ronique should see a psychiatrist during the recommended year. I feel the plaintiff should recovery $2,400 for future psychiatric care. I reached that figure by allowing for two one-hour visits per month at $100 per visit.
The following medical bills were presented at trial:

United Medical of N.O.............. $2,029.15
Diagnostic Medical Imagin ............ 222.50
Henry M. Duhe & Associates............ 135.00
Prescriptions ......................... 32.35
Dr. Thomas Whitecloud ................ 812.90
St. Mary's Clinic .................... 585.00
Tulane Medical Center Hospital ..... 1,709.70
TOTAL ............................. $5,526.60

The plaintiff is certainly entitled to recover the above medical expenses as special damages. Additionally, she is obviously entitled to a certain amount of general damages as payment for pain and suffering and for mental anguish, which is recoverable in a tort action. Gele v. Markey, 387 So.2d 1162, 1163 (La.1980).
Upon a finding of abuse of discretion an appellate court is never allowed to simply decide what it considers an appropriate award on the basis of the evidence as it sees it. Coco v. Winston Ind., Inc., 341 So.2d 332, 335 (La.1976). Instead, the appellate court is limited to a determination of the highest amount the factfinder could reasonably have awarded. Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691, 694 (La.1981). We find that the highest amount the jury could reasonably have awarded for this plaintiff's physical and mental injuries was $30,000. She may recover only $30,000 plus medical expenses of $5,526.60 and future psychiatric expenses of $2,400, for a total of $37,926.60, not the $75,000 awarded by the jury.
AMENDED AND AFFIRMED.
BARRY and SCHOTT, JJ., dissent with written reasons.
SCHOTT, Judge, dissenting with reasons.
I agree with the dissenting opinion of Judge Barry. In addition I find support for the jury verdict in Dr. Chester's testimony that Ronique's family's financial circumstances required them to depend on public health care rather than the private sector. Chester stated: "If it was a family that had insurance and means to be treated outside of the State system I would recommend Ronique work with somebody once or twice a week as a way to gain function." Asked if given that opportunity how long it would take the child to get over her problems, he stated she would always have pain because her life had really changed, and she would never fully recover from her problems.
From Chester's testimony the jury was likewise justified in finding that Ronique's psychological problems were not caused by her grandmother's death or her parents' divorce. Chester stated:
".... hypothetically if Ronique had experienced the divorce and the death in the family and not been hurt physically she may not have ever come into treatment because in a couple of weeks or in a couple of months she might have felt better and it wouldn't have gone to the point of developing a depressive disorder or anxiety disorder. That is what I usually see in the case with someone who didn't have the injury occur. The timing of what happened is very very important."
I cannot conclude that the jury abused its much discretion in making its award.
*437 BARRY, Judge, dissenting with reasons.
The majority discounts and overlooks some of the medical testimony and totally ignores the testimony of the victim.
The record shows that on January 17, 1985 at about 7:00 a.m. Ronique, 14 years old, who was living with her mother, aunt and sister in an apartment owned by Mr. and Mrs. Cruse, descended the outside stairs in drizzling rain on her way to school. Ronique slipped and grabbed the railing which gave way, causing her to fall several feet and land on top of the rail. Her school books were between her and the concrete floor. She experienced pain in her breasts and legs, went to school, but left around noon. Ronique and her aunt did not tell Mrs. Amedee about the accident for several days, after which the youngster went to St. Mary's Clinic.
Dr. Kirby Green, an internist, testified he examined Ronique on January 25, 1985 and found multiple soft tissue contusions of the breasts and right posterior upper thorax, soft tissue injuries to both knees and post-trauma headaches. He prescribed a tight bra, warm moist compresses to the chest area, and physical therapy with moist heat, massage and ultrasonics. He also prescribed ruffen, an anti-inflammatory non-steriod and soma. Dr. Green opined that some patients can suffer for years from such soft tissue injuries.
Ronique went to physical therapy until being admitted to the hospital from January 31 to February 4, 1985. X-rays and a CAT scan were normal and she was discharged from the clinic in February. She returned to school about the beginning of March.
Ronique saw Dr. Whitecloud, an orthopedic surgeon, on May 14, 1985, was hospitalized in Tulane Medical Center for two days and underwent a lumbar myelogram and urological evaluation which were normal. Dr. Whitecloud felt her problems were psychological. He saw her May 24, 1985 when he prescribed darvocet for pain, and saw her last on October 8, 1985.
In May, 1986 Ronique saw Dr. Ralph Chester, a psychiatrist, who diagnosed an adjustment disorder with mixed emotional features of depression and anxiety. She visited a female counselor weekly pursuant to the doctor's orders and saw Dr. Chester again in August, 1986 when he prescribed an antidepressant. She improved for a while, but had to discontinue the drug due to side effects. Dr. Chester did not attribute Ronique's emotional problems only to the fall. Rather, he felt her parents' 1975 divorce and her grandmother's death also affected Ronique. However, he did link the mental problem to her accident. Dr. Chester noted the time interval since Ronique's accident, but explained there is a customary resistance to seeing a psychiatrist. He recommended one additional year of counseling once or twice a week. His testimony is uncontradicted.
The majority quotes Dr. Chester extensively, but fails to include:
Q. Do you think she is malingering in any way over the problem she had?
A. No, I don't think so.
Referring to future counseling, Dr. Chester said:
Q. If she had that opportunity how long would it take her to get over these problems?
A. I think she may always experience some pain, in thinking about what happened in the accident. Her life has really changed, she's missed some things for awhile.
When you say get over, I don't think she'll ever. It's not like people in psychotherapy who wipe things out of their mind. I think she could recover a lot of the things she couldn't do because of fear and pain in about a year of therapy with someone trained to work with children and adolescents.
As to future psychological treatment costs:
Q. What do you charge?
A. The usual fee for a child psychiatrist to charge in this community is between ninety and a hundred and thirty dollars for fifteen minutes worth of work. Personally, I charge one hundred dollars.
*438 The majority ignores Ronique's testimony. She stated that she still has pain (at time of trial) and had not resumed normal physical activities, such as running track and marching in the band. Her parents similarly testified to the changes. During Ronique's testimony she cried and said she did not know why Dr. Chester said her problems were mental when she knew she felt pain.
Pursuant to interrogatories the jury found the defective premises posed an unreasonable risk of harm that caused the accident, concluded Ronique was not at fault, and awarded $75,000. An appellate court cannot disturb a damage award unless the record clearly reveals that the trier of fact abused its discretion in making the award. La.CC. Art. 2324.1 (pre-1984 Art. 1934(3)); Reck v. Stevens, 373 So.2d 498 (La.1979).
The record clearly supports a finding of extensive soft tissue injuries and substantial pain. The breast injuries at puberty could have precipitated or contributed to the emotional problems. Ronique was hospitalized twice, had to undergo a myelogram (considered very painful by most), CAT scan, physical therapy, required psychological counseling, and still has pain. Medical bills total $6,273. Future psychological treatment was estimated at $10,000. The majority disregarded Dr. Chester's estimate and arbitrarily set $2,400.
I feel the $75,000 award for damages and specials is at the upper limit; however, under these particular circumstances and considering this particular plaintiff, I do not find an abuse of discretion. Reck v. Stevens, supra.