574 So.2d 1256 (1991)
Bobby Ray ROBERTS, Jr.
v.
Joseph T. BENOIT, The City of New Orleans, Parish of Orleans, Criminal Sheriff for the Parish of Orleans, State of Louisiana, Charles Foti, Individually, and XYZ Insurance Companies.
No. 89-CA-1104.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 1991.
Writs Granted March 22, 1991.
*1257 Ronald A. Welcker, Glorioso & Welcker, and Frank D'Amico, New Orleans, for plaintiff/appellant Bobby Ray Roberts, Jr.
Jacob J. Amato, Jr., Lisa A. Dunn, Amato & Creely, Gretna, for plaintiffs/appellees Kathy Roberts, Nikisha Roberts, Jamila Roberts and Bobby Ray Roberts, III.
S. Guy deLaup, Hall, Lentini, Mouledoux & Wimberly, Metairie, for defendant/appellant Joseph T. Benoit.
T. Allen Usry, Fred Schroeder, Usry & Weeks, Metairie, for appellants Charles C. Foti, Jr. and The Ins. Guar. Ass'n.
Before ARMSTRONG, PLOTKIN and BECKER, JJ.
*1258 BECKER, Judge.
This appeal arises from a lawsuit instituted by the plaintiff, Bobby Ray Roberts, Jr., for damages he sustained when defendant, Joseph T. Benoit, discharged his gun. Defendant Benoit, at the time of the incident, was a commissioned deputy sheriff with the Criminal Sheriff's Office for the Parish of Orleans. In the suit, plaintiff named as defendants, Joseph T. Benoit, The City of New Orleans, the Parish of Orleans, the Criminal Sheriff for the Parish of Orleans, the State of Louisiana, Charles Foti individually and Southern American Insurance Company, the insurer for the Criminal Sheriff's Office. Plaintiff's wife, Kathy Roberts, individually, and on behalf of their three minor children, intervened in the action.
Prior to trial, defendants, the City of New Orleans and the State of Louisiana, were dismissed from the action. Southern American Insurance Company, the insurer for the Criminal Sheriff's Office, was found to have gone bankrupt, and the Insurance Guaranty Association took over the defense for the insurance company and the Criminal Sheriff's Office.
After a bench trial, judgment was rendered in favor of the plaintiff in the amount of $785,000.00 against defendants, Joseph T. Benoit, the Criminal Sheriff for the Parish of Orleans, and Insurance Guaranty Association. Intervenor, Kathy Roberts, was awarded damages of $25,000.00 for herself individually and $10,000.00 for each of the three minor children.
Plaintiff appeals, seeking an increase in damages. Defendant, Joseph T. Benoit also appeals, arguing that the trial court erred in awarding excessive damages, in failing to find the plaintiff comparatively negligent, and in failing to allow counsel for Benoit to recall one of its witnesses, Merlin Fontenette. Defendants, Charles Foti as Criminal Sheriff for the Parish of Orleans and Insurance Guaranty Association, contend on appeal that the trial court erred in holding the criminal sheriff liable for defendant Benoit's action, in awarding excessive damages, and in failing to find the plaintiff comparatively negligent.
In 1979, defendant, Joseph T. Benoit, was hired by Sheriff Charles Foti as a cook in the Orleans Parish Criminal Sheriff's Office. Benoit became commissioned as a deputy sheriff in January 1981. The kitchen personnel were commissioned as deputy sheriffs in order to obtain state supplemental pay. Prior to being commissioned, Benoit and the other kitchen workers completed a training course.
The training received by defendant Benoit was performed on an intermittent basis. The training consisted of approximately three days a week for a few hours a day over a six week period. There was only one day devoted to firearms training at the firing range which lasted approximately eight hours. Upon completion of this training, Benoit became a commissioned deputy sheriff thereby becoming authorized to make arrests, enforce the law, wear a badge and carry a gun "on duty" as well as "off duty" pursuant to his commission.
The incident sued upon occurred on Sunday, October 25, 1981. On that day, Benoit had worked at the Sheriff's Office performing his regular kitchen duties on a twelve hour shift until 2:30 p.m. He then went home, bathed and went to his mother-in-law's home. Benoit then proceeded to his sister's home. While there, he consumed a beer. Then, Benoit, and his brother-in-law, Merlin Fontenette, drove to the plaintiff's home. The purpose of going to the plaintiff's home was to have the plaintiff, Roberts, repair a light in Benoit's vehicle.
On arrival at Roberts' home, Benoit had another beer in his hand. The plaintiff, at this time, was involved in putting a stereo system in his brother-in-law's, Roy Farria, vehicle. While at plaintiff's home, Benoit drank a glass of wine. Defendant had in his possession two weapons; an M1 carbine rifle in the trunk of his car, and a .38 Charter Arms revolver in an ankle holster strapped to his leg. Benoit removed the revolver from the holster and handed the gun to his brother-in-law, Merlin Fontenette. Fontenette then handed the revolver back to Benoit. Benoit continued to handle the weapon. At one point, he opened the cylinder of the revolver, and the bullets fell *1259 out of the gun. Plaintiff helped Benoit retrieve the bullets and told Benoit to put the gun away. Plaintiff had asked Benoit several times to put the gun back in the holster. At some point, while Benoit was handling the weapon, the gun discharged injuring the plaintiff, Bobby Ray Roberts, Jr.
As a result of the shooting, plaintiff lost his right eye as well as a portion of the right temporal lobe of his brain. The plaintiff has lost fifty percent of his vision in his left eye from the removal of the damaged brain matter, thus resulting in a loss of seventy-five percent of his total vision. Plaintiff also suffers from neuralgia, an irritated nerve that causes pain to the right side of his face. Roberts has a severe memory loss problem, and a visual perception problem, defined as an inability to acquire information rapidly. The visual perception disability has affected plaintiff's fine motor skills, resulting in plaintiff's inability to continue in his occupation as a mechanic. The plaintiff has also suffered from behavioral changes, e.g. irritability, slowness, loss of coordination and disorientation.
Plaintiff and defendants all seek a review of the damages awarded by the trial court. Plaintiff argues that the damages are inadequate while the defendants contend the award is excessive. The law is clear that much discretion is generally left to the trier of fact in the assessment of damages in a tort suit. C.C. article 1999; Perniciaro v. Brinch, 384 So.2d 392 (La. 1980); Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.1987), writ denied, 506 So.2d 1227 (1987). Before a court of appeal may disturb such an award, the record must clearly reveal that the trier of fact abused its "much" discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977). Once an award is found to be insufficient or excessive, the appellate court may examine comparable cases for guidance in determining an appropriate award. Reck v. Stevens, 373 So.2d 498 (La. 1979). Even then, an appellate court can only raise (or lower) the award to the lowest (or highest) point which was within the lower court's discretion. Coco, supra.
A review of the trial record reveals that the trial court did not abuse its discretion in awarding damages of $785,000.00 to the plaintiff. As a result of the incident, Mr. Roberts has completely lost his right eye as well as a portion of the right temporal lobe of his brain. Additionally, he has lost fifty percent of the vision in his left eye, resulting in a loss of seventy-five percent of his total vision. The plaintiff also suffers from neuralgia, an irritated nerve which causes pain to the right side of his face.
As a result of the loss of brain tissue, plaintiff has severe memory loss problems, a visual perception problem, and behavioral problems. Dr. Richard Strub, a neurologist, examined the plaintiff on November 8, 1985. Dr. Strub, testified that the plaintiff had difficulty with coordination and balance, as well as difficulty with verbal memory and expression. Dr. Strub noted that these deficits are permanent and that the plaintiff had reached his maximum recovery. Plaintiff's behavioral problems included disorientation, depression, frustration, irritability, and slowness. Dr. Strub related these problems directly to plaintiff's injury.
The plaintiff was also evaluated by Dr. William Black, a neuropsychologist. At trial, Dr. Black testified that the plaintiff had significant behavioral problems which would affect his interaction with others. Dr. Black also noted that the plaintiff was impaired in the areas of verbal comprehension and abstract reasoning. Dr. Black further testified that plaintiff's visual perception problems resulted in a significant impairment in plaintiff's fine motor skills. Dr. Black stated that these problems are indicative of the type of brain injury suffered by the plaintiff. Dr. Black suggested that the plaintiff should receive treatment intermittently for the rest of his life as the plaintiff is at greater risk for developing future emotional and behavioral problems.
Furthermore, both witnesses testified that the plaintiff would have problems finding *1260 employment as a result of his memory problems. At the time of trial, Mr. Roberts was employed as an operating engineer with a local hotel. Mr. Joseph Williams, plaintiff's immediate supervisor, testified that he watches over the plaintiff and has taken the blame for several of the plaintiff's mistakes. In fact, Mr. Williams acknowledged that he has arranged for plaintiff to have the same days off as he has so that Williams can directly supervise plaintiff's actions.
Mr. Williams' testimony corroborates the testimony of Dr. Robert D. Vooght, a rehabilitation counselor, who evaluated the plaintiff on February 26, 1988. Dr. Vooght testified that Mr. Roberts has problems with memory and distractibility. According to Dr. Vooght, the plaintiff is not competitively employable and needs supervision in whatever job he may take on.
Dr. Melvin Wolfson, plaintiff's economist, testified that Mr. Robert's actual lost wages to the date of the trial was $70,527.00. At the time of trial, plaintiff was still working and receiving a salary of $16,000.00 a year. Dr. Wolfson testified that if the plaintiff stopped working immediately, his future lost wages would be $455,000.00. However, if plaintiff was employed for another year, his lost future wages would be $301,000.00. If plaintiff worked for six years, there would be lost future wages of $266,185.00. And if plaintiff was to continue to be employable for eleven years, Mr. Roberts' lost future wages would be $260,000.00.
Defendant's economist, Kenneth Boudreaux, testified that Mr. Roberts' lost wages from the date of the incident to the date of trial were $174,120.00. Mr. Boudreaux further testified that the plaintiff did not incur any loss of future wages as plaintiff's income with his present employer was significantly higher that what he had earned on a continuous basis prior to the accident.
Considering the evidence presented, we can not say that the trial court abused its discretion in awarding plaintiff damages of $785,000.00.
Defendants also contend that the trial court erred in not finding the plaintiff comparatively negligent. Plaintiff and defendants produced at trial two versions as to how the shooting occurred. Defendant, Benoit, and his brother-in-law, Merlin Fontenette, testified that the gun discharged as plaintiff was returning the weapon to Benoit. The trial court, when faced with the two versions, made a credibility decision. The trial judge, in his reasons for judgment stated,
"The deputy attempted to justify his actions by suggesting that Mr. Roberts might have contributed to his own injury. This Court was not impressed. As a matter of fact the record is replete with statements which demonstrate that the deputy had difficulty honoring his oath to speak the truth. This Court is obligated to observe that when comparing the testimony of the several witnesses who were on the scene at the time of the actual incident, Deputy Benoit's is least likely to be accurate.
This Court finds that the descriptive events leading up to the wounding of plaintiff, Bobby Ray Roberts, Jr., as stated by plaintiff's witnesses, is rational, consistent and believable."
The Louisiana Supreme Court has consistently held that
"when there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1983).
Proper review requires that the appellate court determine from the record whether *1261 the trial court's findings are clearly wrong or manifestly erroneous. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
The trial court did not commit error in failing to find the plaintiff comparatively negligent. Faced with the two versions of how the incident occurred, the trial judge, within his discretion, made reasonable credibility determinations. The trial judge chose to believe the plaintiff and his witnesses. There is more than sufficient evidence to support the credibility determinations and factual findings of the trial judge. We conclude that the trial court's findings as to the absence of plaintiff's comparative negligence are not manifestly erroneous or clearly wrong.
Defendants, Charles Foti, as the Criminal Sheriff for the Parish of Orleans and Insurance Guaranty Association allege that the trial court erred in holding Sheriff Foti liable for Deputy Benoit's actions. The trial court specifically found that "(i)n commissioning Deputy Benoit, without adequate training, ... the Criminal Sheriff failed to act reasonably or responsibly," and that the "inaction of Sheriff Foti and his staff ... contributed mightily to the disastrous shooting of plaintiff, Bobby Ray Roberts, Jr."
The trial court further stated,
"This Court believes that Sheriff Foti has a duty of extrordinary care to see to it that his deputies are properly trained in the use of a dangerous instrumentality.

* * * * * *
[Sheriff Foti] was solely responsible for the shortcomings of his deputy with respect to the deputy's training or lack thereof. He put a badge, a commission and a loaded gun into the hands of Deputy Bonoit when he was totally unprepared to accept this awesome responsibility."
Defendants argue that Sheriff Foti's alleged failure to properly train Deputy Benoit was not a cause-in-fact or legal cause of plaintiff's injury. They further contend that the Sheriff had no duty to protect the plaintiff against the risk of being shot by Deputy Benoit.
The evidence presented at trial appears to support plaintiff's allegations of negligent training and negligent hiring. Deputy Benoit and other defense witnesses testified that the training given to the kitchen personnel was done on an intermittent basis. Deputy Benoit further testified that for over a period of six weeks, he received classroom instructions three days a week for approximately four to six hours a day. There was only one day, i.e. eight hours, of instruction and practice on the firing range.
Annelle Ishmael, the program manager for the Police Officers Standard in Training Council, testified that the POST training requirements for law enforcement officers was a minimum of two hundred and forty hours of instruction, of which thirty hours was to be in firearms training. Ms. Ishmael also testified that in 1979-1980 her office was examining deputy sheriffs submitted by Sheriff Foti for accreditation. However, her records indicate that there was no examination made of Deputy Benoit.
Dr. George Kirkham, plaintiff's expert on police training, testified that the training received by Deputy Benoit in regards to the use of firearms was grossly deficient. In particular, Deputy Benoit was not conversant in the mechanical operations of the gun. He did not know the difference between the cylinder and the chamber of a gun. Further, when asked to differentiate between a single action and double action weapon, Benoit was unable to do so.
Further, Benoit did not know how to safely handle a gun. Dr. Kirkham testified that it is never safe to pass around a loaded weapon. Benoit testified that he was not informed never to pass around a loaded weapon. Nor was he instructed on the proper way to hand a gun to another person. Dr. Kirkham testified that these deviations, among others, in Benoit's training significantly contributed to the shooting incident.
Defendants contend that the incident occurred solely through Deputy Benoit's negligence *1262 in handling a weapon while consuming alcoholic beverages. Defendants argue that Sheriff Foti had written regulations against such actions. However, Deputy Benoit testified that he never did receive any such written regulations.
Furthermore, it should be noted that the Sheriff's office was not only negligent in training Deputy Benoit, but also in hiring him in the first place. Benoit admitted on cross-examination that he lied on his employment application with the Sheriff's Office. Benoit stated on the application that he had a high school diploma. Benoit testified that he really only had a ninth grade education. Benoit also admitted while he stated on the application that he had no convictions, he had been convicted of driving while intoxicated. Benoit was also required to take a general intelligence test when he applied for employment with the Sheriff's office. He received an unsatisfactory grade on the test. Dr. Kirkham testified that, under professional standards, a person, such as defendant Benoit, who falsifies an employment application and receives an unsatisfactory score on an intelligence test, would not be eligible for a commissioned law enforcement position.
In fact, L.S.A.-R.S. 33:1432.1, which provides for the employment and commissioning of deputy sheriffs, requires that all candidates for such commissions have a high school education and receive within one year of employment, four weeks or one hundred and sixty hours training at an accredited law enforcement school. Further, L.S.A.-R.S. 40:2401 et seq, required in 1981, that "every peace officer ... shall successfully complete a basic law enforcement training course conducted by a training center accredited by the council" on police standards and training. L.S.A.-R.S. 40:2405. Under the definitional statute, a peace officer includes any "fulltime appointed or commissioned employee of a sheriff's department." R.S. 40:2402(1). Clearly, under the facts of this case, Deputy Benoit should not have been commissioned as a criminal deputy sheriff. The trial court did not commit manifest error in its findings that Sheriff Foti negligently hired and/or trained Deputy Benoit.
Thus, the next question is whether the Sheriff's negligence was a legal cause of the plaintiff's injuries. It must be noted Deputy Benoit testified that it was only pursuant to his commission that he was carrying the weapon which injured the plaintiff.
A defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury, and a legal cause of the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Fowler v. State Farm Fire & Casualty Insurance Company, 485 So.2d 168 (La. App. 2nd Cir.1986), writ denied, 487 So.2d 441 (La.1986). The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, supra. Further, there can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm which occurs and is substantial in nature. Nix v. Brasly, 489 So.2d 1038 (La.App. 1st Cir. 1986); Bodoin v. Daigle, 452 So.2d 828 (La.App. 3rd Cir. 1984), writ denied, 458 So.2d 485 (La.1984).
The determination of causation in fact is merely the first step in determining liability under the duty-risk analysis. The court must also determine what duty was imposed on the defendant under the particular circumstances, whether there was a breach of that duty that resulted in damages, and whether the risk which resulted in the damages was encompassed within the scope of the protection extended by the imposition of that duty. Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970); Sibley v. Gifford Hill and Co., Inc., 475 So.2d 315 (La.1985).
While the causal relation issue involves an analysis of the defendant's conduct as a contributing factor in the injury, the duty issue is a policy inquiry into whether the *1263 defendant's duty to the victim included protection against the particular injury. Green, The Causal Relation Issues in Negligence Law, 60 Mich.L.Rev. 543 (1962); Sibley v. Gifford Hill and Co., Inc., supra.
Reviewing the law and evidence, we find that the trial court did not commit manifest error in finding that Sheriff Foti's negligence in commissioning defendant Benoit as a deputy sheriff was a cause in fact of the plaintiff's injuries. Benoit himself admitted that he was carrying the gun only pursuant to the commission. Further, the weapon was not purchased by Benoit until after he received his commission as a deputy sheriff. Benoit also testified that he considered this gun to be his "off-duty" weapon, which he was allowed to carry pursuant to the commission. There appears to be no uncertainty that if Benoit had not been commissioned as a deputy sheriff, he would not have been carrying the weapon on the day in question.
Thus, the next question to be answered is whether Sheriff Foti had any duty to protect the plaintiff from defendant's actions. The granting of a deputy sheriff commission places much responsibility on the shoulders of the person commissioned. Upon becoming a commissioned deputy sheriff, a person becomes authorized to make arrests, to enforce the law, to wear a badge and carry a gun "on duty" as well as "off duty". Sheriff Foti has unfettered control in the granting of criminal deputy sheriff commissions. As such, Sheriff Foti has the obligation to ensure that those who are commissioned as deputy sheriffs have sufficient training, most particularly in the area of the use of firearms.
The law is clear that a loaded gun is a dangerous instrument and imposes a duty of care on those who have control of it. Webb v. Smith, 555 So.2d 556, 558 (La.App. 4th Cir. 1989); Tolleson v. State Farm Fire and Casualty Co., 449 So.2d 105 (La.App. 1st Cir.1984), writ denied, 450 So.2d 968 (La. 1984). Likewise, Sheriff Foti has a duty to ensure that the people whom he commissions as deputy sheriffs are adequately trained in the use and handling of firearms. We agree with the trial judge's statement that "the trusting public, who permits Sheriff Foti to hire his deputies, has a right to expect that they will be well trained and fully qualified in the proper and proficient use of firearms. The plaintiffs as a part of that public are beneficiaries of that trust."
We find that the evidence supports the trial court's determination that Sheriff Foti did indeed breach his duty to ensure that Deputy Benoit, as a commissioned deputy sheriff, was adequately trained in the use of firearms. The failure to adequately train Deputy Benoit clearly was a cause in fact of plaintiff's injuries. But for his commission as a deputy sheriff, defendant Benoit would not have been carrying the weapon which caused plaintiff's injuries.
Defendant Benoit's last assignment of error concerns the trial court's refusal to allow the defendant to recall Merlin Fontenette. Defendant Benoit attempted to recall Mr. Fontenette to refute the testimony of Wayne Centanni. Mr. Centanni, a private investigator, had obtained a taped statement from Mr. Fontenette concerning the incident sued upon. Apparently, this statement was taken close in time to the actual incident. Plaintiff called Mr. Centanni as a rebuttal witness when Fontenette gave a version of the incident inconsistent with the taped statement. Defendant argued that Mr. Fontenette should have been allowed to refute the statement as plaintiff was not able to confirm, through any evidence, that Mr. Centanni actually spoke with Fontenette. Further, defendant suggests that the testimony of Mr. Fontenette in question went to the issue of comparative negligence.
Mr. Centanni testified that although he had taken the statement over the telephone, he had never met Mr. Fontenette prior to trial. Centanni also admitted he was not an expert in the comparison of voices. Even though the trial court may have committed error in not allowing defendant to recall Mr. Fontenette, such error is harmless. The trial court had more than sufficient testimony from all the other witnesses presented to determine the issue of comparative negligence. Any testimony *1264 by Mr. Fontenette refuting the statement would not have had any significant impact on the trial court's findings.
Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
PLOTKIN, J., concurs in part and dissents in part with written reasons.
PLOTKIN, J., concurring in part and dissenting in part with written reasons:
I disagree with the majority's decision holding Orleans Parish Criminal Sheriff Charles Foti and the Orleans Parish Criminal Sheriff's Office (hereinafter collectively referred to as "the sheriff") primarily liable for the injuries received by plaintiff Bobby Ray Roberts Jr. when he was shot by Deputy Sheriff Joseph T. Benoit. However, I believe that the sheriff should be held vicariously liable for Benoit's act under the Louisiana Supreme Court's recent decision in Ermert v. Hartford Ins. Co., 559 So.2d 467 (La. 1990), which significantly changed the law on employer vicarious liability. Therefore, I concur on that issue.
Additionally, I believe the trial court abused its great discretion in setting the award at only $785,000 to compensate the plaintiff for the serious injuries he suffered as a result of being shot in the face. I would raise the award to $907,275.95, which I believe is the lowest award reasonable under the circumstances. I also believe that the majority improperly ignored the evidence which establishes that the plaintiff was comparatively negligent in causing his own injury. I would reduce the total award by 10 per cent to reflect the plaintiff's comparative negligence, making his final award $816,548.35. Therefore, I dissent on the quantum and comparative negligence issues.

LIABILITY OF THE SHERIFF
Primary liability
In order to establish primary liability on the part of a defendant, the plaintiff generally must prove four elements: (1) duty, (2) breach of duty, (3) cause-in-fact and (4) legal cause. Pitre v. Opelousas General Hospital, 530 So.2d 1151, 1155 (La.1988).
Both the trial court and the majority based the liability of the sheriff at least partially on the finding that the training given Benoit prior to the receipt of his commission as a deputy sheriff was inadequate. The trial court stated in its reasons for judgment that the sheriff had breached his duties to Roberts by failing to properly train Deputy Benoit and by putting "a badge, a commission and a loaded gun into the hands of Deputy Benoit when he was totally unprepared to accept this awesome responsibility." The reasons for judgment state specifically that the sheriff's "negligent acts of omission resulted in the irresponsible action of his deputy and the consequential wounding of Mr. Roberts" and that placing a weapon in Benoit's hands "was a license to shoot, maim and even kill, irresponsibly." No further attempt to perform a duty-risk analysis was made; nonetheless, it is obvious from the reasons that the trial court found the sheriff primarily liable for Roberts' injury.
In response to arguments made by the sheriff in this court, the majority attempts to perform a duty/risk analysis. They conclude that the sheriff was negligent in both inadequately training Benoit and in hiring him in the first place. They then attack the difficult causation questions presented by this case and conclude that the sheriff's actions or inactions were a cause-in-law of Roberts' injuries because "Benoit himself admitted that he was carrying the gun only pursuant to the commission," because Benoit did not purchase the gun until after he received his commission, and because Benoit testified that he considered the gun his "off-duty" weapon, which he was allowed to carry pursuant to his commission. The majority concludes that "[t]here appears to be no uncertainty that if Benoit had not been commissioned as a deputy sheriff, he would not have been carrying the weapon on the day in question." The legal causation issue is not addressed directly.
After having read the testimony of all the eyewitnesses to the event, I am not convinced that the plaintiff carried his burden *1265 of proving that any of the sheriff's actions or omissions were a cause-in-fact of his injuries. I have no quarrel with the conclusion that the training given Deputy Benoit was inadequateDr. Kirkham's testimony on that issue was convincing and unrefuted. However, I fail to see the causal connection, found by the trial court, between the lack of training and the plaintiff's injuries.
Additionally, I disagree with the majority's finding that Benoit would not have been carrying the gun on the day of the accident had he not been a commissioned deputy sheriff. That finding is based entirely on a very selected reading of the testimony of Deputy Benoit. Although it is true that Benoit stated a couple of times that he considered the gun his "off-duty" weapon, he also said that he had purchased the gun for his wife and that he did not carry the gun on his person, but kept it locked in the trunk of the car. The trial court specifically found that Benoit's testimony was incrediblea conclusion with which I hardly agree given the vast array of equivocation and contradictions evidenced in that testimony. Although the jurisprudence in this state does not require an especially close connection between the defendant's actions and the plaintiff's injuries to establish cause-in-fact, some connection is required. I believe that in this case that connection is tenuous at best.
Vicarious liability
Despite the above conclusions, I concur with both the trial court and the majority decisions holding the sheriff liable for Roberts' injuries; however, I would base that liability on a different theory altogether. Although I do not feel that the plaintiff met his burden of proving all the necessary elements to establish primary liability on the part of the sheriff, I cannot escape the conclusion that the sheriff must be held vicariously liable as Deputy Benoit's employer under my reading of the Louisiana Supreme Court's decision in Ermert, supra.
The supreme court's decision that vicarious liability of employers for the actions of their employees must be based upon something other than a duty/risk analysis after Ermert, supra, is demonstrated in the following pronouncement:
The master's vicarious liability for the acts of its servant rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. In determining whether a particular accident may be associated with the employer's business enterprise, courts often attempt to determine whether, considering the authority given to the employee, the employee's tortious conduct was reasonably foreseeable. What is considered reasonably foreseeable in this context, however, is quite different from the "foreseeably unreasonable risk of harm" that spells negligence. Rather than looking for risks that can and should be avoided, as is the case with negligence, the court must essentially decide whether the particular accident is a part of "the more or less inevitable toll of a lawful enterprise." The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his commercial activity in spite of all reasonable precautions on his own part. If the particular harm was reasonably foreseeable and the employer failed to take proper precautions to prevent it, he could be primarily liable for his own fault rather than secondarily liable for the fault of his employee. When considering which risks the employer must bear under vicarious liability, however, the proper test bears more resemblance to that which limits liability for workers' compensation than to the test for negligence, because the employer should be held to anticipate and allow for risks to the public that "arise out of and in the course of" his employment of labor.
Ermert, supra, 559 So.2d at 476. (Citations omitted.)
*1266 The Ermert case also discusses situations where the employee's actions serve his own purposes:
Because vicarious liability is imposed based upon the attribution of business-related risks to the enterprise, specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or of a third person. The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. So also, the act may be found to be in the service if not only the manner of acting but the act itself is done largely for the servant's purposes.
Id. at 477. (Emphasis added.) (Citations omitted.)
The court also differentiated between finding vicarious liability when the servant's actions constitute an intentional tort and when the servant's actions are merely negligent, stating that a "court in a negligence case need only determine whether the servant's general activities at the time of the tort were within the scope of his employment." Id. at 478.
In Ermert, the Supreme Court held that a fence company executive was within the "course and scope" of his employment when he accidentally shot a guest at a hunting camp which he personally owned. The court found that the executive had "repeatedly and consistently" used the hunting camp for business purposes because he had sold fences to most of the other members of the hunting club, he had taken customers to the camp for entertainment, the other members and the customers had referred business to him, and he had taken his employees and members of a company-sponsored baseball team to the camp. Id. at 478. The supreme court found that the trial court "could reasonably conclude that one of Decareaux's motives for participating in the camp was to provide a place to entertain both customers and employees of" the fence company. Id. The case does not discuss any connection between the specific act which caused the harm and the injuries suffered by the plaintiff.
Although I realize that the court placed some emphasis on the fact that the employee in question in the Ermert case was actually the owner of the company, that emphasis was based primarily on the principle that the "scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks." Id. at 477. Although the employee in question in this case had no executive duties in the performance of the employer's business, the authority and freedom of action bestowed on him by the sheriff was great. When Benoit was given his commission as a deputy sheriff, he was granted the authority to carry a concealed weapon both on duty and off duty. Thus, I believe that the principles of the Ermert case should be applied to find liability here.
Additionally, the risk that someone will be accidentally shot is certainly a reasonably foreseeable consequence of the act of commissioning a deputy sheriff and giving him the authority to carry a concealed weapon. That risk increases when the deputy in question neither meets the minimum qualifications for employment at the sheriff's office nor receives adequate training in the proper use of firearms. The evidence in the record is clear that the purpose of serving the sheriff's business "actuated" Benoit's decision to carry the gun to an appreciable extent. Id. at 477. Since employers are required to anticipate risks to the public "arising out of and in the course of" their employment of labor, the sheriff must be held vicariously liable here. Id.
For the above and foregoing reasons, I concur in the majority's decision holding the sheriff liable for the plaintiff's injuries.
Quantum
The trial court awarded Roberts an in globo award of $785,000, for the following elements of damages, without specifying *1267 the amount assigned to each element: (1) pain and suffering at the time of the accident, (2) pain and suffering for the remainder of his life, (3) loss of eyesight, (4) loss of brain capacity, (5) disfigurement (permanent), (6) subsequent health problems, (7) medical bills, (8) loss of income and earning power (or reduced earning capacity).
In globo awards are legally permissible, they are generally disapproved for several reasons. First, the litigants and the appellate courts are unable to determine the allocation of damages to specific injuries and thus must resort to speculation and retrospection in analyzing and reviewing the damages. Second, they lack precedential value for future cases concerning the proper amount to be assigned to certain injuries. Finally, in globo awards do not serve the goal of judicial efficiency in this complex age when victims are entitled to recover for damage to multiple rights. Thus, I will allocate the damages in determining whether the trial court abused its discretion in making the award.
The majority simply documents Roberts' injuries and concludes that "[c]onsidering the evidence presented, we can not [sic] say that the trial court abused its discretion in awarding plaintiff damages of $785,000." I disagree; after reading the record and considering the circumstances of the case, I believe that the $785,000 award is inadequate to compensate the plaintiff for his serious injuries and the dramatic consequences of those injuries on his life. See Reck v. Stevens, 373 So.2d 498, 501 (La. 1979); Amedee v. Cruse, 526 So.2d 433, 433 (La.App. 4th Cir. 1988).
In Reck, supra, the court stated that reviewing courts must consider the individual circumstances of the case under review to determine whether an award is excessive or inadequate, before considering prior awards for similar injuries. Id. The following rule should be applied when determining whether a trial court abused its great discretion in setting the quantum:
The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inference from the evidence before it.
Amedee, supra, 526 So.2d at 433, citing Bitoun v. Landry, 302 So.2d 278, 379 (La. 1974). Once the reviewing court determines that the award is improper, it may consider awards in similar cases and may increase or decease the award only to the lowest or highest award which would have been within the trial court's discretion. Amedee, supra, 526 So.2d at 436.
The medical evidence in the instant case reveals that the plaintiff was shot in his right eye and was required to undergo major surgery for the removal of the eye and the right temporal lobe of his brain. The loss of brain matter resulted in the loss of 50 percent of the vision in his left eye, meaning that he lost 75 percent of his total vision. He also suffers from neuralgia, which causes pain in the right side of his face.
Other consequences of the loss of brain matter include memory loss, limited visual perception, diminution of fine motor skills, and coordination and balance difficulties, according to the medical evidence. The evidence is clear that the accident and its consequences has caused the plaintiff numerous emotional and relationship problems, including the break-up of his marriage and difficulties with his job.
Special damages
The plaintiff has only two items of special damages: medical expenses and lost wages. The medical expenses submitted into the record totalled $6,566.45. Actual loss of wages between the date of the accident and the time of trial was calculated by the plaintiff's expert at $70,527 and by the defendant's expert at $174,120. Since the award may be reduced only to the lowest amount within the trial court's discretion, I would use the plaintiff's figure, $70,527, as the actual lost wages.
Loss of future wages or earning capacity is more difficult to calculate. At the time of trial, the plaintiff was employed at the Bourbon Orleans Hotel earning $8.65 per hour, for a total yearly salary of approximately $16,000, more than the average salary earned by the plaintiff during the three *1268 years immediately prior to the accident. On the basis of this information, the sheriff argues that the plaintiff will not suffer any future loss of wages.
However, the defendant ignores the uncontroverted testimony of plaintiff's supervisor at the Bourbon Orleans, Joseph Williams, who stated that Roberts is unable to work without close supervision and that the plaintiff has experienced numerous problems at work during his employment which might have resulted in his termination had Williams not intervened. Williams' testimony coupled with the psychological and medical testimony presented at trial establishes unequivocally that the plaintiff will experience some future loss of wages or loss of earning capacity.
In Hobgood v. Aucoin, 569 So.2d 542 (La. 1990), the Louisiana Supreme Court recognized the principle that a comparison of the plaintiff's earnings before and after the accident "is not necessarily determinative of his future ability to earn." Id., at 544-45. The court stated as follows:
Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Id. See also Fernandez v. The M/V Rio Limay, 572 So.2d 730 (La.App. 4th Cir. 1990).
The plaintiff's expert estimated Roberts' loss of future wages between $445,025 and $215,340, depending on how long after the trial the plaintiff was able to continue performing the job at the Bourbon Orleans and applying the assumption that the plaintiff could earn only minimum wage after leaving that job. Since it is impossible to determine how long the plaintiff would keep his job, I would set the loss of future wages and loss of earning capacity award at the average of the two figures cited above, or $330,182.50. That figure, I believe, is the lowest within the trial court's discretion.
For the above and foregoing reasons, I would calculate the plaintiff's total special damages award as follows:

Medical expenses $ 6,566.45
Past loss of wages 70,527.00
Future loss of wages and loss of
 earning capacity 330,182.50
 __________
TOTAL $407,275.95

General Damages
The plaintiff in the instant case should receive general damages in an amount sufficient to compensate him both for his loss of sight and for his loss of brain capacity, as well as the attendant consequences for both of those lossesthe pain and suffering, disfigurement, and subsequent health problems. Rather than itemize a figure for each of those items of damages, I will discuss only the two major areas of loss and include the consequences within the general damages awards for each.
In a recent case involving damage to an eye and subsequent related problems, this court affirmed a trial court general damage award of $400,000. In re Medical Review Panel of Lisa Borne, 566 So.2d 147 (La.App. 4th Cir.), writ denied 571 So.2d 633 (La.1990). The plaintiff in that medical malpractice case suffered an eye infection after being fit for contact lenses, which required her to undergo surgery and post-operative complications. In setting the award, the trial court considered the plaintiff's young age, the limitation of her social and recreational activities, the dimunition of her future earning capacity, and the side effects of the surgery, as well as the risks of future surgeries.
In Landry v. State Farm Fire & Cas. Co., 504 So.2d 171 (La.App. 3d Cir.1987), the court awarded general damages of $245,704.32 to a plaintiff who suffered the complete loss of vision in his right eye. The plaintiff's eyeglasses were broken when he was struck while assembling a mail order stairway. In addition to the loss of sight, he suffered retinal detachment in both eyes and faced the possibility that the *1269 condition might eventually require the removal of his right eye. In a similar situation, the plaintiff in Moolekamp v. Rubin, 531 So.2d 1124 (La.App. 4th Cir.1988) received a general damage award of $250,000 in compensation for loss of the vision in his right eye as a result of defective cataract surgery.
The injuries to the plaintiff's eyes in the instant case were even more devastating than those suffered by the plaintiffs in the cases described above. Thus, I believe that the lowest general damages award for the plaintiff's loss of vision within the trial court's discretion was $250,000.
Prior general damage awards involving plaintiffs who suffered permanent brain damage also demonstrate the inadequacy of the trial court's in globo award to this plaintiff. In a case involving permanent brain damages caused by carbon monoxide poisoning from a gas heater, a husband and wife were awarded $350,000 and $375,000, respectively, in general damages. Gines v. State Farm Fire & Cos. Co., 516 So.2d 1231 (La App. 2d Cir. 1987), writ denied 519 So.2d 127 (La.1988). In a case with very similar consequences to those experienced by the plaintiff in the instant case, a plaintiff who experienced permanent brain damage and was employable only under close supervision was awarded $653,941.65 in general damages. Moreau v. State ex. rel. DOTD, 527 So.2d 1221 (La.App. 3d Cir.1988). The plaintiff in that case was injured in an automobile accident.
After comparing the brain damage and its consequences suffered by the plaintiff in this case to those suffered by the plaintiffs in the cases detailed above, I believe that the lowest general damage award within the trial court's discretion on this issue is $250,000, for a total general damage award of $500,000. Adding this amount to the $407,275.95 special damage award discussed above, I believe that the lowest total award within the trial court's discretion is $907,275.95. I would amend the judgment to this amount.

COMPARATIVE NEGLIGENCE
The trial court rejected the contention of the defendants that the total award should have been reduced by the plaintiff's comparative negligence on the basis of its finding that Deputy Benoit's version of the story was not believable. Specifically, the court said that "when comparing the testimony of the several witnesses who were on the scene at the time of the actual incident, Deputy Benoit's is least likely to be accurate." The court also found that "the descriptive events leading up to the wounding of plaintiff ... as stated by the plaintiff's witnesses, is rational, consistent and believable." The majority simply cited these statements by the trial court to justify its failure to consider the comparative negligence issue.
However, even a cursory reading of the record reveals that the comparative negligence evidence presented at trial is gleaned from the testimony of the plaintiff's witnesses, not from Benoit's testimony. Benoit stated at trial that the gun was in the trunk of his car when he arrived at Roberts' house and that he retrieved the gun in response to a conversation initiated by Roberts. Benoit said that Roberts wanted to show the gun to his brothers-in-law, John and Roy Farria. According to Benoit's version of the events, the gun accidentally discharged while Roberts was handing it back to him after having shown it to the Farria brothers.
The plaintiff's witnesses stated that Benoit arrived with the gun concealed in an ankle holster and that Benoit took the gun out of the holster and initially handed it to his brother-in-law, Merlin Fontennette. It was the plaintiff's witnesses who said that Benoit started "playing" with gun after receiving it back from his brother-in-law. The plaintiff's witnesses said that Benoit had the gun out of the holster, in plain view, for some 30 to 45 minutes before the shooting and that Roberts asked him to put it away as many as three or four times. The plaintiff's witnesses, who the trial court believed, said that the bullets fell out of the gun during this time and Roberts picked them up and handed them back to Benoit. On the basis of that testimony, I *1270 would find the plaintiff comparatively negligent for his injuries.
It is obvious from the record that Roberts appreciated the danger of staying in the same vicinity with Benoit while Benoit was playing with the gun. This fact is demonstrated both by the fact that Roberts repeatedly asked Benoit to put the gun away and by Roberts' testimony that he was trying to hurry up and finish the job he was working on so that he could get away from Benoit. Under the circumstances, Roberts was comparatively negligent in staying in the same area as Benoit. That comparative negligence was compounded by Roberts' action when he picked up the bullets and returned them to Benoit. Had he retained the bullets while they were in his possession, the shooting would not have occurred. Thus, I would reduce the plaintiff's recovery by 10 percent to reflect his comparative negligence, making his total award $816,548.35.
For the above and foregoing reasons, I dissent from the majority's decision on the quantum issue and the comparative negligence issue.