586 So.2d 607 (1991)
Marilyn BERNARD
v.
ROYAL INSURANCE COMPANY, et al.
No. 90-CA-0928
Court of Appeal of Louisiana, Fourth Circuit.
August 28, 1991.
Writ Denied November 15, 1991.
*610 Evan F. Trestman, New Orleans, for plaintiff/appellee.
Wood Brown, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for defendants/appellants, Whitney Jones a/k/a Whitney Jones, Jr., the Regional Transit Authority, Intern. Ins. Co. and Royal Ins. Co.
Claude D. Vasser, Vasser & Trinchard, New Orleans, for defendant/appellee, Truck Ins. Exchange.
Before GARRISON, BARRY and BECKER, JJ.
BARRY, Judge.
Marilyn Bernard's personal injury lawsuit, based on negligence and strict liability, resulted in a jury verdict of $14,648,594. Liability was conceded. The primary issue on appeal is quantum.

THE ACCIDENT
Ms. Bernard was hospitalized at the time of trial and her doctors advised her not to testify in court. Her deposition was taken July 15, 1987 and November 11, 1989. The depositions were read to the jury and contained the following details.
On July 29, 1985 around 1:00 p.m. Ms. Bernard, 24-years-old, attempted to board an RTA bus which had stopped on Basin St. near Canal St. A number of people had already entered the bus and her friend, Sonya Farrow, was in line behind her. Ms. Bernard placed her left leg on the first step of the bus when the door closed and trapped her leg. She banged on the door with her umbrella, but the driver pulled off.
Ms. Bernard attempted to keep her balance by hopping along on her right leg. She screamed at the driver to stop and continued to knock on the door. The bus gained speed and Ms. Bernard was dragged alongside. People on the bus and sidewalk yelled at the bus driver as the bus turned onto Canal St. The driver finally opened the door and Ms. Bernard fell free in the street. The front wheel of the bus rolled over her right leg and it "burst open" and sounded "like a large balloon dropping out of the sky." She described her leg's bones as crushed into "millions of pieces" and it looked like a "mutilated animal." "Things were jumping" in her leg and she feared bleeding to death because the leg was almost torn from her body.
Sonya Farrow corroborated how the bus door trapped Ms. Bernard's leg and dragged her in the street. Ms. Farrow stated the bus wheel rolled over Ms. Bernard's leg and "[e]verything just splattered. I saw bones, the whole bit."
Ms. Bernard testified that "it took the ambulance forever" to arrive and the attendants could not give her pain medication. Emergency room personnel at Charity Hospital could not relieve her pain. She was told that the leg would probably be amputated.
An arteriogram was performed. Several doctors were "poking objects" into the leg and Ms. Bernard described excruciating pain and frustration before surgery. A "monstrous device" (immobilizing unit) had been placed on her leg. She was hospitalized for months and underwent innumerable *611 surgeries, skin and muscle grafts, and debridements.
Ms. Bernard was first treated by Dr. Glenn Ruffin, psychiatrist, in February, 1987. She had extreme depression, explosive periods of temper, was withdrawn, and did not care if she lived or died. She thought people saw her as a freak. She experienced nightmares and feared she would lose her leg. She could not ride in or see a bus without experiencing fear. She refused to ride in an automobile unless necessary. At the time of the July, 1987 deposition she was hospitalized at Coliseum Medical Center and saw Dr. Ruffin weekly.
Ms. Bernard said the doctors were uncertain about her prognosis. A transplanted bone from her left leg did not heal and walking caused fractures of the bone. A small amount of effort caused total exhaustion and she was unable to do housework, cook, wash her hair or other daily activities. She took medication for pain and sleep.
In her 1989 deposition Ms. Bernard described her life after the accident as "hell" because her future had been destroyed, a romantic relationship ended, and she lived in constant pain and felt that life had nothing to offer. She assumed that she would be hospitalized from time to time for the rest of her life and she had no future plans.

PROCEDURAL BACKGROUND
Ms. Bernard sued Whitney Jones, Jr. a/k/a Jones Whitney, Jr. (bus driver), the Regional Transit Authority (RTA), Transit Management of Southeast Louisiana, Inc.[1] (owner of the bus and employer of the driver), State of Louisiana, Flxible Corporation, General Automotive Corporation, Grumman Aerospace Corporation, Grumman Allied Industries, Inc. and Rohr Industries, Inc. (manufacturers and distributors of the bus).[2] International Insurance Company, RTA's liability insurer, intervened. Ms. Bernard's supplemental petitions requested a jury trial and added as defendants International Insurance Company, Royal Insurance Company and Truck Insurance Exchange, the insurers for RTA and Transit Management of Southeast Louisiana.
Prior to trial Truck Insurance Exchange paid its $400,000 policy limits, and RTA paid its retained sum of $100,000. Whitney Jones, RTA, International Insurance Company and Royal Insurance Company admitted liability.
The jury awarded:

Past and future physical
 pain and suffering: $2,000,000
Past and future emotional
 and mental anguish: $2,000,000
Past medical expenses: $ 300,000
Future medical expenses: $5,905,994
Past lost wages: $ 67,600
Future loss of earning capacity: $1,850,000
Past and future loss of enjoyment
 of life: $ 25,000
Disfigurement: $1,500,000
Permanent disability: $1,000,000

The trial court adopted the jury's verdict and on November 21, 1989 rendered judgment against Whitney Jones, RTA, Truck Insurance Exchange, International Insurance Company and Royal Insurance Company jointly, severally, and in solido for $14,648,594, plus legal interest from judicial demand and all costs.
Whitney Jones, RTA, and International Insurance Company moved to have the judgment reflect the $500,000 pre-trial payment. *612 Truck Insurance Company moved to amend and requested reasons for judgment because it claimed that its liability at the time of trial was limited to interest on the $400,000 it had paid. Royal Insurance Company's motion for a new trial relates to its coverage in excess of $20,000,000.
Pursuant to stipulations as to the $500,000 payment, the court rendered an amended judgment on December 21, 1989 against Whitney Jones, Jr., RTA, International Insurance Company and Royal Insurance Company, jointly, severally and in solido for $14,148,594, plus legal interest from the date of judicial demand and for all costs. The court awarded Ms. Bernard legal interest on the $500,000 paid by Truck Insurance Exchange and RTA from the date of judicial demand until paid, but did not assess court costs. The court awarded interest on the interest owed until it was paid.
Truck Insurance Exchange filed a motion for a new trial and/or amendment of the judgment to delete the interest on interest award. Ms. Bernard filed a motion for a new trial to change the December 21, 1989 judgment to the language in the November 21, 1989 judgment. Truck Insurance Exchange paid interest of $102,824 and filed a motion to be dismissed.
On March 30, 1990 the court denied the various motions for a new trial and, ex proprio motu, granted a new trial and rendered the same judgment.
The court rendered a judgment on March 30, 1990 which dismissed Truck Insurance Exchange with prejudice.

APPEAL
Whitney Jones, RTA, International Insurance Company and Royal Insurance Company, appeal the November 21, 1989, December 21, 1989 and March 30, 1990 judgments. Ms. Bernard filed a motion to dismiss the defendants' appeal due to insufficiency of the appeal bond and/or defects in the form of the bond, as well as motions to traverse the amount of the bond and to test its surety. On March 30, 1990 the court denied the motion to test the surety and granted motions relating to sufficiency of the bond. The court noted that the bond was for the amount of the judgment plus interest and did not protect the plaintiff through the appellate process. The court ordered an additional $10,000,000 be posted, making a total bond of $30,000,000. Ms. Bernard also appealed the judgments.
Whitney Jones, RTA, International Insurance Company and Royal Insurance Company submit:
(1) The award is excessive and should be set aside or reduced;
(2) A multiplicity of errors during trial necessitates a new trial, or alternatively the matter should be decided by this Court on the record;
(3) Royal Insurance Company's motion for a new trial seeking dismissal because of its excess coverage should have been granted.
Ms. Bernard's appeal asks that:
(1) Truck Insurance Exchange's dismissal be reversed because it may be liable for interest on the entire judgment, not the $400,000 paid;
(2) Royal Insurance Company be recast as Royal Indemnity Company.

DEFENSE ERROR NO. 1 THE AWARD IS EXCESSIVE
The defendants submit two arguments relative to the amount of the award.
Basically, the defendants argue that the total of the multi-million dollar judgment is incontrovertible evidence that the jury was prejudiced. Defendants contend the judgment must be reduced because it is more than twice the amount of any judgment in Louisiana. They submit that the jury not only compensated Ms. Bernard, but also punished the defendants because of the inflammatory nature of the accident.
The size of any award depends on its component general and special damages, and each case will be evaluated on its own unique facts. Admittedly, Ms. Bernard's trauma has been extraordinary and cannot be compared with any other claimant. Defense counsel, in response to a question from this Court, stated that in his *613 opinion Ms. Bernard's damages has a value of $3,000,000.
We will review this particular plaintiff's claims under the proven facts in the record. We hold that the jury's award cannot be excessive, ipso facto, simply because of its size. See Reck v. Stevens, 373 So.2d 498 (La.1979).
In the alternative, defendants argue that several components of the award are excessive and/or improper and should be significantly reduced.
An appellate court should not disturb an award unless the record shows that the trier of fact abused its much discretion. The question is not whether a different award might have been more appropriate under the circumstances, but whether the award of the trial court or jury can be reasonably supported by the evidence. Bitoun v. Landry, 302 So.2d 278 (La.1974); Amedee v. Cruse, 526 So.2d 433 (La.App. 4th Cir.1988).
After the reviewing court finds an abuse of discretion by the trial court or jury, it can review prior cases to determine an appropriate award. The appellate court may lower the award to the highest point or raise the award to the lowest point which is reasonable. Reck v. Stevens, 373 So.2d at 498; Coco v. Winston Industries, 341 So.2d 332 (La.1976); Runnels v. Esteves, 550 So.2d 1225 (La.App. 4th Cir. 1989), writ denied 558 So.2d 1126 (La. 1990).

PAST MEDICAL EXPENSES
The defendants do not contest $300,000 for past medical expenses. That amount was conceded in closing argument to the jury.

FUTURE MEDICAL EXPENSES
The defendants argue that $5,905,994 for future medical expenses, the exact amount requested by Ms. Bernard, is excessive. They submit the evidence does not support the award which is based on Ms. Bernard's hospitalization in a mental institution for six months of every year during her lifetime.
Future medical expenses must be established with some degree of certainty. A plaintiff must show that the expenses more probably than not will be incurred. Crowther v. Kmart Corporation, 568 So.2d 669 (La.App. 4th Cir.1990), writ denied 571 So.2d 656 (La.1990).
Robert Voogt, Ph.D., Ms. Bernard's certified rehabilitation counselor, testified that she suffers from physical and mental problems:
depression, post-traumatic stress disorder and chronic pain;
stress fractures of the right leg;
right leg shorter than her left leg;
right foot larger than the left which causes imbalance;
muscle weakness in the left shoulder, arm, neck and back;
limitation in lifting;
decreased tolerance of sitting and standing;
decreased sensation in right leg;
difficulty using steps;
inability to bathe and dress alone;
limitation on cooking, cleaning, laundry, dancing, exercise, social activities;
constipation, nausea, and indigestion;
anxiety and anger;
social isolation and suicide ideation;
inability to sleep and nightmares;
poor self-image due to weight gain;
body disfigurement and chronic pain.
Dr. Voogt used statistics from the U.S. Dept. of Health and Human Resources to project a life expectancy of 47.6 years and concluded that Ms. Bernard more probably than not would never return to work. He reviewed the doctors' reports and medical records, but he failed to discount his monetary projections to present value.
Dr. Voogt estimated the one time cost for future medical treatment, which includes a comprehensive inpatient program, physical therapy, pain management evaluation and treatment, at $263,308. He established five totals for annual medical costs, depending on Ms. Bernard's treatment regime, *614 then he multiplied each yearly total by 47.6 years, and added in the $263,308.

 At home: $ 1,925,072
 Hospital (3 months): $ 4,224,485
 Hospital (6 months): $ 6,529,800
 Hospital (9 months): $ 8,835,164
 Hospital (12 months): $11,075,696

Dr. Voogt testified that each of the five totals include: medical evaluations and treatment, psychiatrists, therapeutic evaluations, attendant and support care, equipment, medications, inpatient psychiatric care, and eight hours of attendant care at home. The document containing his calculations was proffered.
Dr. Melville Wolfson, Ms. Bernard's forensic economist, used Dr. Voogt's estimates and added a 7% medical inflation factor based on U.S. Department of Labor figures for the twelve month period which ended July, 1989. (Over the past twenty years medical costs rose 8.3% per year). Dr. Wolfson used 7.5% to discount to present value (closer to the highest rate of 7.8% on treasury bonds and not the lowest rate of 5.5% on passbook savings). Dr. Voogt's calculations were:

At home: $ 1,748,548
Hospital (3 months): $ 3,824,608
Hospital (6 months): $ 5,905,994
Hospital (9 months): $ 7,987,422
Hospital (12 months): $10,012,653

Dr. Jonathon Wood, defendants' economist, did not submit variable projections. He was provided Dr. Voogt's yearly estimate of $34,911 which was based on Ms. Bernard not being hospitalized. He multiplied by her years of life expectancy, used a 11.5% discount (legal interest rate), and arrived at $336,663.76 for future medicals. Dr. Wood did not factor in medical inflation costs.
The jury adopted $5,905,994, Dr. Wolfson's estimate, which is based on six months hospitalization out of every year. Support for that award must come from Ms. Bernard's psychiatrists.
Dr. Richard Morse, psychiatrist in charge of Touro's pain unit, stated that Ms. Bernard would need outpatient treatment for the rest of her life. He said "she's going to be in and out of psychiatric hospitalizations."
Dr. Glenn Ruffin, treating psychiatrist, testified that he first saw Ms. Bernard on February 9, 1987 because of her depression. She had withdrawn from friends and family and was very isolated. The mutilation of her leg and more than twenty operations caused psychiatric problems. He said Ms. Bernard considered suicide and experienced a psychotic episode because the last operation did not straighten her leg.
Dr. Ruffin said Ms. Bernard's has a traumatic and post-traumatic syndrome with major depression and psychotic features. She did not respond to medications and had side effects from drugs. Dr. Ruffin was asked whether Ms. Bernard would remain in a depressed condition for the rest of her life, and responded that she would adjust to a lower function level, have lower expectations, become completely withdrawn from reality, or commit suicide ("the more likely possibility").
Dr. Ruffin also concluded that Ms. Bernard would probably be in and out of psychiatric hospitals the rest of her life. While at home she would require assistance most of the day. Ms. Bernard's counsel tried to elicit from Dr. Ruffin that she would remain in Coliseum Medical for at least six to twelve months, but he replied that if Ms. Bernard did not improve he would administer different treatment.
The defendants argue that there is no medical evidence that Ms. Bernard would be in a mental institution for six months of every year for the rest of her life. They contend Ms. Bernard will be hospitalized one month of every year based on Dr. Morse's testimony that she had been hospitalized for one month in the pain unit during his year of observation.
We note that Ms. Bernard was not hospitalized for psychiatric treatment from July, 1985 until February, 1987. Dr. Ruffin and Dr. Morse testified that she would be in and out of psychiatric hospitals for the rest of her life. However, there is no testimony that Ms. Bernard would be hospitalized during half of her life; hence, the award of $5,905,994 was a clear abuse of discretion.
*615 Normally, at this point, we would review comparable awards for guidance. However, other cases which evaluated a crushed or mutilated leg have no probative value when compared with Ms. Bernard's experiences. The photographs in evidence reveal a gruesome, deformed leg, and a horribly scarred body from tissue transplants. It is clear that her psychological problems will require extensive, indefinite medical treatment.
We find the highest reasonable award should be based on Dr. Wolfson's calculations that Ms. Bernard would be hospitalized three months of every year for the rest of her life. Dr. Wolfson's testimony presents the more probable scenario and his projections properly reflect life expectancy, inflation and the discount factor.
We amend the award for future medical expenses to $3,824,608.

LOST WAGES
The defendants argue that $67,600 for lost wages is not supported by the record. We agree.
Ms. Bernard's $12,564 gross salary[3] per year multiplied by four years amounts to $50,256. Dr. Wolfson stated that the wage loss from the accident date to the time of trial would amount to approximately $50,000. Ms. Bernard's counsel submitted $50,000 to the jury. The jury abused its discretion by awarding $67,600.
The past wage loss is amended to $50,256.

FUTURE LOSS OF EARNING CAPACITY
The defendants argue that $1,850,000 for future loss of income does not reflect Ms. Bernard's status or her future. They point out that Ms. Bernard's counsel asked for $1,680,415 in closing argument, but that figure represents $1,630,415 in future and $50,000 in lost wages.
The amount of lost future income is not solely predicated on the difference between actual earnings before and after a disabling injury. Another factor is the difference between the victim's earning capacity before and after the accident. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of future income encompasses the loss of or reduction of a victim's earning potential which includes the capability to do that for which the victim is equipped by nature, training, and experience. Coco v. Winston Industries, 341 So.2d at 332.
Experts' calculations merit substantial consideration when assessing impairment of earning capacity. Factors include the victim's physical condition before the accident, work history, previous earnings, and the probability that but for the injury the victim would have earned similar wages for the remainder of her working life. Garrett v. Celino, 489 So.2d 335 (La. App. 4th Cir.1986). Such awards are inherently speculative and cannot be fixed with mathematical precision. Sherlock v. Berry, 487 So.2d 555 (La.App. 4th Cir.1986), writ not considered 489 So.2d 912 (La. 1986).
Ms. Bernard testified that she received a B.S. degree in biology from Xavier University in 1983. From 1983 to 1985 she was a substitute teacher for the Orleans Parish School Board. Shortly before the accident (age 24) she interviewed with the Orleans Parish Lead Poison and Prevention Center to start work for about $12,600 per year. Ms. Bernard considered a full-time job in the Orleans school system and contemplated "some time in the future" going to medical school. She never applied to graduate school.
In her deposition on November 11, 1989, Ms. Bernard stated that she planned to work at the Lead Prevention Center for a year or two and obtain a master's and doctorate degree in public health. She considered applying to medical school.
Michael Andry, Director of Special Health Programs for the New Orleans Department of Health, confirmed that he interviewed Ms. Bernard shortly before the *616 accident. She applied for a Civil Service laboratory position which paid $12,564 yearly and he hired her. Mr. Andry said that she told him of her plan to attend graduate school.
Ellen Boston, Asst. Dean of Tulane School of Public Health and Tropical Medicine and Director of Admissions, reviewed Ms. Bernard's resume and transcripts. She testified that Ms. Bernard was qualified to become a tropical medicine graduate student and probably as a candidate for a doctorate.
Athena Porter, a high school friend, testified that Ms. Bernard planned to work in the health department until she could save money for graduate school and to pursue a medical degree. Yolanda Bourgeois, a college friend, testified that Ms. Bernard's plans included work in public health to obtain funds for medical school.
Dr. Wolfson's calculations as to future wage loss assumed that she would never work. He factored in inflation, fringe benefits, and applied a 7.5% discount to arrive at three projections:

 Civil Service job with
 promotions without a
 graduate degree: $ 867,833
 With a Master's degree: $1,401,577
 With a Ph.D.: $1,630,415

He used age 61 as her retirement age based on U.S. Dept. of Labor figures. The $1,680,415 figure submitted to the jury by Ms. Bernard's counsel includes $50,000 past lost wages. The jury arrived at $1,850,000 based on the unrealistic assumptions that:
Ms. Bernard would obtain a Master's degree in Public Health and Tropical Medicine;
She would earn $31,000 while she studied for a doctorate;
With a Ph.D. her salary would be $37,000 and increase over the years to $70,000.
Dr. Wood, defendants' economics expert, applied a work life expectancy of 22.65 years based on Dept. of Labor statistics. He used a salary of $12,600 per year and applied a discount rate of 11.5%, the legal interest rate. He used a 2% and 6% yearly growth to arrive at $135,149.06 to $194,550.17.
Over the objection of Ms. Bernard's counsel, Ms. Daisey Hobgood, Director of Retail Marketing Administration for Capital Initiatives, testified for the defense. She used a life expectancy of 48 years and assumed a 3% increase compounded annually on a monthly basis. Ms. Hobgood stated that a one time premium of "a couple of hundred thousand dollars" would generate $12,600 per year, or $1,047 per month, after a 15% reduction for taxes.
Defendants attempted to show that Ms. Bernard could be rehabilitated. Judith Lide, vocational rehabilitation expert, testified that she reviewed medical reports and interviewed Ms. Bernard for about one hour. She said Ms. Bernard was under treatment for depression, but was articulate and had above-average intelligence. Ms. Lide said Ms. Bernard could work as a private tutor or a teacher in a ground floor classroom. Ms. Lide testified there were job possibilities if Ms. Bernard worked with her after her medical release. However, Ms. Bernard was still hospitalized at the time of trial.
Ms. Bernard cites two cases to support the award. In Socorro v. Orleans Levee Board, 561 So.2d 739 (La.App. 4th Cir. 1990), aff'd in part and rev'd in part 579 So.2d 931 (La.1990), the claimant was a freshman at Delgado College. The issue was the appropriate work life expectancy figures to compute future loss of earning capacity. Mr. Socorro's award of $338,000 was premised on his finishing college because he was a college student when he was injured. Ms. Bernard had not enrolled in a graduate program during the more than two years after she received her undergraduate degree.
In Lee v. USAA Casualty Insurance Company, 540 So.2d 1083 (La.App. 1st Cir. 1989), writs denied 542 So.2d 514 and 515 (La.1989), the 16-year-old junior high school honor student planned a career as a financial consultant. The economist based his calculations on the assumption that plaintiff would finish college with a math degree. The $706,200 jury award for lost *617 future earnings was affirmed. Ms. Bernard received a college degree two years before the accident and was 24 years old. Whether Ms. Bernard would enter the graduate level or pursue a doctorate degree is far more speculative than a junior high honor student finishing college.
The defendants cite Shackman v. Daigle, 447 So.2d 629 (La.App. 4th Cir.1984). A 43-year-old mother returned to college and was in her sophomore year when a neck injury precluded her from completing college and going to work as a psychiatric nurse. The issue was whether the trial court (which determined there was no disability) correctly refused to allow plaintiff's vocational rehabilitation expert to testify concerning loss of future wages. This Court stated that the expert's "plotting of plaintiff's future was too speculative" and "provided no basis for a claim for future wages." Id. at 631.
In Molbert v. Toepfer, 540 So.2d 577 (La.App. 3rd Cir.1989), aff'd 550 So.2d 183 (La.1989), a 28-year-old college engineering student with average grades, worked for his father in construction. An economist projected future economic loss based on plaintiff obtaining a degree and working as a mechanical engineer. The testimony was uncontroverted, but the trial court awarded $600,000, far less than the range given by the expert. The Third Circuit affirmed and noted that plaintiff had not earned a degree or worked as a mechanical engineer prior to the accident.
Dr. Wolfson's projections are premised on the highly speculative assumption that Ms. Bernard would eventually obtain a doctorate in tropical medicine. She graduated in May, 1983 from Xavier University with a B.S. degree. At the time of the accident (1985) Ms. Bernard had taken no steps to begin a graduate program. She did not work in her specialty or at a full-time job from May, 1983 until July, 1985. Ms. Bernard's only employment after college was as a substitute teacher for two years and she did not remember whether she earned enough money to file a tax return. In her 1987 deposition she stated (as an aside) that she considered going to medical school "some time in the future". In her 1989 deposition she mentioned that she intended to seek a graduate degree in public health.
The record convinces us that the jury abused its discretion. There is no evidence or indication that Ms. Bernard would complete a master's program and earn a doctorate degree. She made no effort to initiate a graduate career. Thus, Dr. Wolfson's calculation of $1,630,415 was based on very unrealistic assumptions. We must lower the award to the highest reasonable award under the circumstances.
Dr. Wolfson's alternative calculations are based on the plausible assumption that Ms. Bernard would work in a laboratory, a position she accepted just prior to her accident. Her salary would have been $12,600, she would receive promotions over the years, and future loss of earnings would be $867,833.
We amend the award for loss of future earning capacity from $1,850,000 to $867,833.

GENERAL DAMAGES
The award for general damages totals $6,525,000:

 Past and future physical
 pain and suffering: $2,000,000
 Past and future emotional
 and mental anguish: $2,000,000
 Past and future loss of enjoyment
 of life: $ 25,000
 Disfigurement: $1,500,000
 Permanent disability: $1,000,000

The defendants argue that all general damages should be reduced to a total of $825,000.
General damages do not have a common denominator and are determined on a case by case basis. They involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Boswell v. Roy O. Martin Lumber Company, 363 So.2d 506 (La.1978); Prothro v. Dillahunty, 488 So.2d 1163 (La.App. 2d Cir. 1986). Factors to be considered in assessing quantum for pain and suffering are severity and duration. La.C.C.Art. 1999; *618 Miller v. Winn Dixie Stores, Inc., 527 So.2d 989 (La.App. 3rd Cir.1988), writ denied 531 So.2d 763 (La.1988).
It is impossible for a judge or jury to fully compensate for the loss of a normal human life. Ms. Bernard suffered and will suffer immeasurable physical and mental pain. Her shattered leg led to the surgical destruction of her body through innumerable medical procedures:
arteriography of the right lower leg, irrigation and debridement;
additional debridements;
a bone scan;
right femoral arteriogram;
microvascular transfer of latissimus dorsi-muscle to right leg;
numerous skin grafts from various body areas;
microvascular transfer of rectus abdominus muscle and skin graft to the right lower leg;
microvascular transfer of left fibula segment to right tibia defect;
extraction of pins and removal of external fixation device;
open reduction and internal fixation of right tibia with a plate.
Ms. Bernard testified about her utter frustration because of the surgical procedures, the fear of amputation and the reality of having a deformed leg and body. Her life after the accident was "hell" and she had no hope for the future.
Ester Bernard, plaintiff's mother, testified that her daughter was happy and active prior to the accident. She described how her daughter's personality and life dramatically changed. She said Ms. Bernard withdrew from society, was deeply depressed, and unable to concentrate or cope. Ms. Bernard's friends, Athena Porter, Yolanda Bourgeois and Sonya Farrow, testified about her withdrawn personality and the severe changes in Ms. Bernard lifestyle, such as inability to exercise and to take part in social activities.
Dr. Michael Moses, plastic surgeon, testified that Ms. Bernard lost virtually all of the skin on her right leg below the knee, and all muscles in the middle third of the leg and lower. He recounted the painful debridement operations to remove dead tissue and skin grafts. He described the transplant of muscles from her back and stomach to the leg. Dr. Moses related the operations which failed and subjected Ms. Bernard to second surgeries and weeks in intensive care. He noted the deformities on her back, neck and stomach which will never improve. Dr. Moses summed up: "It's a very ugly leg, and she has scars all over her." He said the leg was "always going to look terrible" and is accurately reflected in the gruesome photographs in evidence.
Dr. Stuart Phillips, orthopedic surgeon, made the decision to reconstruct the leg. He described the bone transplant from the left leg as a substitute for the large bone in the right leg. The transplanted bone broke three times and Ms. Bernard had to wear a brace. He said that medical efforts would never alleviate the pain.
Dr. James Butler, orthopedic surgeon, testified that he performed an osteotomy, which involves cutting the tibia and fibula in the lower leg, re-aligning the leg and holding the bones in place by applying a metallic plate with screws. He recounted the complications and infections which caused additional hospitalizations. The right leg is one-and-a-half inches shorter than the left and Ms. Bernard wears a built-up shoe. Dr. Butler said there will be a need for future surgery due to infection and he expected to treat Ms. Bernard several times a year for the rest of her life. Dr. Butler noted that Ms. Bernard would always be in pain and require medication. She will suffer future complications, including weakness in her left arm due to muscle taken from her back, weakness in the left leg due to the fibula transplant, stiffness in the right ankle which prevents moving the foot up and down, inability to stand for more than twenty minutes, and the necessity to elevate the leg while sitting. The leg brace and shoe support must be worn forever.
Dr. Richard Morse, psychiatrist, detailed Ms. Bernard's constant pain which worsens with a weather change and when she attempts *619 to walk. He stated that the pain gets worse when she has stress and she experiences "bursting her skin." He testified that she is very depressed, distracted, in a psychotic depression, and requires antidepressant drugs. He stated that she is self-conscious of her appearance, very sad, and has nightmares.
Dr. Morse described how nerves were destroyed and that pain radiated to the brain. Ms. Bernard has a post-traumatic reaction, experiences flashbacks, and is phobic about cars and buses. Based on information provided by a neurologist, Dr. Morse said Ms. Bernard has nerve entrapment, nerve injury and reflex dystrophy (a problem with pumping blood). Dr. Markovitz, a blood vessel surgeon, informed Dr. Morse that Ms. Bernard's body has difficulty getting tissue fluid to return. Half of the leg nerves are completely destroyed, some have compression or scarring, and the others pick up the pain syndrome that is memorized at the spinal cord and brain level.
Dr. Morse said Ms. Bernard was very depressed, suicidal and only her religion gives her the desire to live. Ms. Bernard was in the pain unit one month and did not get relief. Nerve blocks (Novocain into nerves in the spinal column) did not stop the pain. She suffers from scar tissue created by removal of the muscles.
Dr. Ruffin, treating psychiatrist, testified that Ms. Bernard had more than 20 operations on her legs, plus numerous skin and bone grafts. She is extremely depressed, feels her body is falling apart, and cannot sleep. He stated that Ms. Bernard expressed a lot of anger. She had withdrawn from friends, stopped seeing her boyfriend, and did not want anyone to see her leg. She experienced a traumatic psychotic episode, must take a quantity of drugs and experiences side effects. She cannot sleep due to nightmares and relives the accident even when she is awake.
The size of the various general damages reflect the jury's reaction to the detailed, necessarily gruesome medical testimony which was not rebutted. It is an understatement to say that Ms. Bernard has suffered and will suffer the ultimate amount of pain. The course of her medical treatment caused, rather than relieved, pain and resulted in utter frustration and false hopes for improvement. There is no guideline to gauge compensation for general damages. This case far transcends one crushed leg. We are confronted with a formerly healthy, 24-year-old college graduate whose life has been destroyed and who will live as a physical and mental cripple, inside a pain-ridden body, for the rest of her 47.6 year life expectancy.
We affirm the jury's award of $4,000,000 for past and future pain and mental anguish, and $25,000 for loss of enjoyment of life.
We are satisfied, however, that the jury abused its discretion by awarding an additional $1,500,000 for disfigurement and $1,000,000 for permanent disability. Under Reck v. Stevens, 373 So.2d 498 (La.1979) and Coco v. Winston Industries, 341 So.2d at 332, once we determine there was an abuse of discretion, we then compare other cases to determine the largest award which would be within the fact finder's discretion.
Under these facts, we again note there is no case comparable for guidance. The medical evidence is detailed above.
We find the highest award which is reasonably within the factfinder's discretion to be $500,000 for disfigurement and $500,000 for permanent disability. We amend the $1,500,000 disfigurement award to $500,000 and the $1,000,000 permanent disability award to $500,000.
The total general damage award is amended from $6,525,000 to $5,025,000.

DEFENSE ERROR # 2 FAIR TRIAL
The defendants argue that the following trial court's rulings, coupled with the judge's attitude, deprived them of a fair trial.

A
An alleged instance occurred during questioning of Dr. Morse, psychiatrist. After Dr. Morse had discounted defense *620 counsel's position that the pendency of a lawsuit exacerbates a patient's condition, counsel then asked whether his request that Ms. Bernard see a vocational rehabilitation counselor could have been the irritant that caused her to be hospitalized. Dr. Morse stated that was a reasonable question, then stated that Ms. Bernard reacts to any stress in the same way, particularly if it involves her condition or being seen in public.
Defense counsel complains that Dr. Morse gave lengthy, non-responsive answers. However, the court allowed Dr. Morse to answer defense counsel's repeated question over Ms. Bernard's counsel's objection. Although defense counsel may not have obtained the answer he wanted, the trial court's ruling did not prejudice his right to cross-examine. Defense counsel concedes that part of Dr. Morse's testimony (settlement aids a patients' recovery) was favorable.
Defendants take issue with Dr. Morse's answer as to whether he had seen spontaneous resolution in patients with Ms. Bernard's condition. He stated: "Not in this kind of case, there are too many factors going on at once." Counsel argues that the remainder of Dr. Morse's answer was nonresponsive. However, it is obvious that counsel's question had been answered. When counsel repeated the question, the court sustained an objection. At that point defense counsel stated that he was precluded from pursuing an important point. We disagree. Dr. Morse answered the question: "Not in this kind of case...." That answer was adequate.

B
The defendants asked Dr. Morse's response to a hypothet concerning Ms. Bernard's potential desire to return to work after the litigation. The court overruled an objection and Dr. Morse's jocular answer was:
Now, you know, if she walked in one day and did that, after I recovered consciousness, I'd call Dr. Ruffin to get my own mental status exam. But, yes, if she did that, that would be the best thing around, but I just don't see that happening.
The defendants argue that the court should have required Dr. Morse to answer the question and then "make jokes about it or whatever." During closing argument defense counsel referred to Dr. Morse's "little joke" during a very serious trial.
Dr. Morse clearly answered that work would be "the best thing around" for Ms. Bernard, the answer counsel wanted to hear. However, his response, "I just don't see that happening" effectively negated the hypothet.

C
The defendants complain that the court improperly ruled on objections during cross-examination of Dr. Ruffin.
Dr. Ruffin testified that Ms. Bernard suffered from post-traumatic stress syndrome and major depression with psychotic features. He said her lawsuit caused stress and resolution of the litigation would be beneficial. Defense counsel's persistent questions about the effect of the lawsuit were met with objections which were overruled. Only then did Dr. Ruffin mention the concept of "green back poultice" and made a lengthy, emphatic response that completion of this lawsuit would not alter Ms. Bernard's life.
Dr. Ruffin was asked by defense counsel if post-traumatic stress syndrome was subject to spontaneous resolution, and said that a mild stress syndrome can be. He categorized Ms. Bernard's case as "very severe," "acute" and "chronic." Dr. Ruffin stated: "I've never seen a case like she has that would be spontaneously responded to." Dr. Ruffin was again asked the hypothetical question (above) relating to Ms. Bernard returning to work, and whether he would tell her not to, and he responded: "No, indeed."
Dr. Ruffin's answers were responsive and lengthy, but cross-examination was not significantly curtailed.

*621 D
During cross-examination of Robert Voogt, Ph.D., a rehabilitation expert, the defendants attempted to challenge his prior statement that he could tell whether a person was in pain. When asked that question on cross-examination, Dr. Voogt responded that he did not have the equipment or personal ability to identify pain. He stated: "I basically have to rely on their self-report and the report of their treating physician." Defense counsel then asked whether Dr. Voogt believed that a treating physician could tell when a person was in pain. An objection was sustained and the court stated: "We'll have someone from the pain clinic, I believe." After defense counsel explained the purpose of the question, the court again sustained the objection and stated: "Let's talk with the physicians with reference to pain. It's a medical diagnosis."
There is no question that Ms. Bernard has suffered excruciating pain. We find no basis to conclude that the defendants were prejudiced by the court's ruling.

E
Defendants complain that they were not allowed to complete their questioning of Dr. Voogt about the absence of a money estimate for vocational rehabilitation. Dr. Voogt had testified that he did not allot that cost because he "heard from Dr. Morse and Dr. Ruffin that she's unemployable." Defense counsel pursued that question and on both occasions Dr. Voogt declared that he did not make the allocation. The court sustained Ms. Bernard's counsel's objection because the question was repetitive.
The question had been asked and answered three times. There was no prejudice.

F
Ms. Bernard's counsel asked Dr. Wolfson about his calculations "as a forensic economist," then mentioned that Dr. Wolfson had been tendered as an expert in forensic and labor economics. Defense counsel had stipulated to his expertise only as a forensic economist (although Ms. Bernard's counsel had previously asked about Dr. Wolfson's calculations as a forensic and a labor economist). The court declared: "And the Court has accepted Dr. Wolfson as and [sic] expert in the field of forensic economics."
Defense counsel claims that his opponent's comment about Dr. Wolfson's expert status was prejudicial. The court clarified that Dr. Wolfson had been accepted as an expert in forensic economics, not labor economics. There was no prejudice.

G
Defendants argue that reversible error occurred because Ms. Bernard's counsel made the following closing argument:
I also want to suggest to you that as between Marilyn Bernard, the plaintiff, and the defendants [sic] if there is security that needs to be given, the benefit of the doubt ought to be given to Marilyn Bernard. If you have any doubt in your mind reasonable [sic] it should be given to Marilyn Bernard because
Defense counsel objected and a bench conference followed. Ms. Bernard's counsel then told the jury that he was not referring to the criminal standard of reasonable doubt:
What I'm suggesting is, is that the evidence will more likely than not show these things. And that within the range of more likely than not as to which figure you will give her that Marilyn Bernard should be given the benefit of the doubt because Marilyn Bernard did not cause this. Marilyn Bernard did not cause this herself. You alone will give her an award for future medical [sic] that will have to last her the rest of her life.
Defendants argue that the first quoted comment shifted the burden of proof to the defendants. We disagree.
The trial court correctly charged the jury that the plaintiff's burden was to establish proof as more probable than not. The court pointed out that the jury's function was to compensate Ms. Bernard for the losses she sustained. The court told the *622 jury that the purpose of the awards was to restore Ms. Bernard as closely as possible to the position which she would have occupied had the accident not occurred. The court also noted that punitive and speculative damages could not be awarded.
In light of the proper jury instruction we find there was no prejudice warranting reversal.
Based on the cold record, we have no basis to find that the trial judge exhibited prejudice against the defendants or in favor of Ms. Bernard.

DEFENSE ERROR # 3 ROYAL INSURANCE COMPANY'S MOTION FOR NEW TRIAL
Royal Insurance argues that its motion for a new trial should have been granted because its excess coverage does not kick in with the $14,648,594 jury verdict. Ms. Bernard responds that one of the primary carriers could become insolvent. Royal Insurance points out that there was no discussion of its policy or cases interpreting excess insurance. The trial court denied Royal Insurance's motion for new trial without argument, then adjusted the appeal bonds without ruling on whether Royal Insurance's policy contained a "drop down" clause.
The defendants' brief only states: "It happens that Royal's policy is not a drop down policy." In its motion for new trial, Royal Insurance stated that it was not liable below $20,000,000. Its appellate brief specifies $25,000,000.
Ms. Bernard cites Nasello v. Transit Casualty Company, 530 So.2d 1114 (La. 1988), in which the Other Insurance Clause read in pertinent part: "For any covered auto you do not own, the insurance provided by this policy is excess over any other collectable insurance."
Royal Insurance's Coverage section provides:
To indemnify the Insured for the Limits of Liability in excess of the Underlying Limits of Liability, both as shown in the Declarations, for all sums which the Insured shall become legally obligated to pay by reason of the liability imposed upon the Insured by law, or assumed by the Insured under contract or agreement....
Royal Insurance's Other Insurance Clause provides:
If other valid and collectible insurance with any other Insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance.
Royal Insurance's limits of liability are stated as: "$5,000,000 each occurrence and in the aggregate where applicable excess of $25,000,000 each occurrence and in the aggregate where applicable, which is, in turn, excess of primaries." International Insurance Company is listed on Royal Insurance's policy as the underlying umbrella insurer with a limit of $20,000,000. International Insurance's policy specifies a $25,000,000 limit with underlying limits of $400,000 by Truck Insurance Exchange and $100,000 for each accident by RTA.
Royal Insurance's Other Insurance Clause is not similar to the provision in Nasello. However, Royal Insurance's policy mirrors the policy provision in McGuire v. Davis Truck Services, Inc., 518 So.2d 1171 (La.App. 5th Cir.1988), writ denied 526 So.2d 791 (La.1988). McGuire was cited by the Supreme Court in Kelly v. Weil, 563 So.2d 221 (La.1990) as an example of an excess policy that would drop down because its underlying limit of excess coverage is dependent on collectibility of primary limits. See also Robichaux v. Randolph, 563 So.2d 226 (La.1990). McGuire's excess insurer's Other Insurance Clause states:
If other valid and collectible insurance, whether or not scheduled hereunder, which is written by another insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of this policy, the insurance afforded by this policy *623 shall be in excess of and shall not contribute with such other insurance.
518 So.2d at 1172-73.
We find that Royal Insurance's coverage drops down if the underlying carrier becomes insolvent. Royal Insurance must be cast in judgment with the other insurers subject to its coverage as an excess carrier.

MS. BERNARD'S APPEAL
Ms. Bernard persuasively argues that the name Royal Insurance Company in the judgment is an error. The policy states the name as Royal Indemnity Company. The judgment will be amended to reflect that the excess insurer is Royal Indemnity Company.
Ms. Bernard appeals the May 30, 1990 judgment which dismissed Truck Insurance Exchange. She submits that Truck Insurance Exchange should remain a party in the event it owes additional interest. Ms. Bernard relies on Glazer v. Louisiana Trailer Sales, Inc., 313 So.2d 266 (La.App. 4th Cir.1975), writ not considered 318 So.2d 47 (La.1975), and its progeny which hold that an insurer is liable for legal interest on the amount of its applicable policy limits from the date of judicial demand until the date of the judgment. Thereafter, it is liable for interest on the amount of the judgment including that which exceeds its applicable policy limits from the date of the judgment until the insurer pays or tenders the amount it owes. Ms. Bernard argues that Truck Insurance Exchange could be liable for judicial interest on the entire award from the date of the judgment, November 31, 1989 or December 31, 1989, until it paid the amount it owed on January 19, 1990.
Ms. Bernard's reliance on Glazer is misplaced. That case involves an insurance policy which contains a supplementary payments clause which is not a part of Truck Insurance Exchange's policy. Also, Glazer is not on point because Truck Insurance Exchange paid $102,824.56 on January 19, 1990, before the final judgment of March 30, 1990.
Truck Insurance Exchange tendered its policy limits pre-trial and subsequently paid the full amount of accrued interest and interest on interest prior to the March 30, 1990 judgment. Truck Insurance is relieved of liability for legal interest on the judgment in excess of its coverage. See Boston Old Colony Insurance Company v. Fontenot, 544 So.2d 739 (La.App. 3rd Cir.1989).
Ms. Bernard concedes that neither International Insurance nor Royal Insurance made any argument that Truck Insurance Exchange should be liable for interest on the amount in excess of its policy. The judgment dismissing Truck Insurance Exchange is affirmed.

SUMMARY
The March 30, 1990 judgment dismissing Truck Insurance Exchange with prejudice is affirmed.
The following awards in the March 30, 1990 judgment in favor of Ms. Bernard are affirmed:

 Past medical expenses: $ 300,000
 Past and future physical pain
 and suffering: $2,000,000
 Past and future emotional and
 mental anguish: $2,000,000
 Loss of enjoyment of life $ 25,000
The following awards are amended:
 Future medical expenses:
 FROM: $ 5,905,994 TO: $3,824,608
 Past Lost Wages:
 FROM: $ 67,600 TO: $ 50,256
 Future loss of earning capacity:
 FROM: $ 1,850,000 TO: $ 867,833
 Disfigurement:
 FROM: $ 1,500,000 TO: $ 500,000
 Permanent disability:
 FROM: $ 1,000,000 TO: $ 500,000
 ________________________________________
TOTAL: FROM: $14,648,594 TO: $10,067,697

The jury verdict is amended from $14,648,594 to $10,067,697 and reduced to $9,567,697 to reflect $500,000 paid by Truck Insurance Exchange and RTA. The judgment is amended to read:

*624 DECREE
IT IS ORDERED that there be judgment in favor of the plaintiff, Marilyn Bernard, and against defendants, Whitney Jones, Jr., a/k/a Jones Whitney, Jr., Regional Transit Authority, International Insurance Company and Royal Indemnity Company jointly, severally, and in solido, in the sum of $9,567,697, with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings.
The following limitations of liability apply:
1. International Insurance Company's coverage begins after the exhaustion of Truck Insurance Exchange's $400,000 policy limit which covers above RTA's retained limit of $100,000. International Insurance Company's liability is limited to $25,000,000;
2. Royal Indemnity Company's coverage begins after exhaustion of International Insurance Company's $25,000,000 policy limit and covers $5,000,000 in excess of that amount.
IT IS FURTHER ORDERED that Regional Transit Authority owes judicial interest on the $100,000 it paid to plaintiff from the date of judicial demand until the amount was paid in full, and that judicial interest is awarded on the judicial interest owed by Regional Transit Authority from the date of judicial demand until it was paid in full.
IT IS FURTHER ORDERED that Truck Insurance Exchange be dismissed with prejudice.
IT IS FURTHER ORDERED that costs shall include the following expert fees:

 Dr. Michael Moses: $350.00
 Dr. Stuart Phillips: $350.00
 Dr. James Butler: $350.00
 Dr. Richard Morse: $350.00
 Dr. Glenn Ruffin: $350.00
 Dr. Robert Voogt: $300.00
 Dean Ellen Boston: $200.00
 Dr. Melville Wolfson: $300.00

The judgment as amended is affirmed.
JUDGMENT IN FAVOR OF MARILYN BERNARD AFFIRMED AS AMENDED; JUDGMENT DISMISSING TRUCK INSURANCE EXCHANGE AFFIRMED
NOTES
[1] In her petition Ms. Bernard alleged the same liability as to RTA and Transit Management under the doctrine of respondeat superior. For purposes of this opinion and decree RTA and Transit Management are synonymous.
[2] The record is not clear as to service of process on the State and the bus manufacturers and distributors. The original petition requests that service be withheld. The first supplemental petition only has a certificate of service stamp. The second supplemental petition requested service of one or more pleadings on RTA, Truck Insurance Exchange, International Insurance Company, and Whitney Jones. The sheriff's returns indicate service on RTA, International Insurance and Truck Insurance Exchange. The third, fourth, fifth and sixth supplemental petitions requested service on the same defendants listed in the second petition plus Royal Insurance, and the returns show service on those defendants. The State, manufacturers and distributors did not participate in the trial and are not named in the judgment.
[3] Gross rather than net income is used when determining lost wages. Harris v. Tenneco Oil Company, 563 So.2d 317 (La.App. 4th Cir.1990), writ denied 568 So.2d 1062 (La.1990).