587 So.2d 143 (1991)
Robert H. HOFFMAN, et al.
v.
The TRAVELERS INSURANCE COMPANY, et al.
No. 91-CA-0268.
Court of Appeal of Louisiana, Fourth Circuit.
September 26, 1991.
Jerald N. Andry, Gilbert V. Andry, III, New Orleans, for plaintiff/appellee.
Michael R. Zsembik, New Orleans, for defendant/appellants, Pax, Inc. and Travelers Ins. Co.
Dale W. Poindexter, Poindexter & Oxner, New Orleans, for defendants/appellees.
Before BARRY, WARD and ARMSTRONG, JJ.
BARRY, Judge.
Robert Hoffman was injured while riding as a passenger in a truck driven by Harold Riley. Riley was driving on a street within the Tenneco Oil Refinery when his truck was hit by a bob cat front end loader driven by Ronnie Sibley and leased to Specialized Industrial Maintenance Company, Inc. (SIM). Hoffman filed suit against Sibley, SIM and their insurer, Travelers Insurance Company. Tenneco Oil Company, Hoffman's employer, and Pacific Employers Insurance Company, Tenneco's worker's compensation insurer, intervened for *144 reimbursement of Hoffman's compensation and medical expenses.
The trial court granted Hoffman's motion for directed verdict on liability on the basis that the accident was caused by Sibley. The jury awarded Hoffman:

 Future medicals: $ 45,000
 Lost past income: $ 21,583
 Lost future income and fringe
 benefits: $400,000
 Past and future pain, suffering
 and mental anguish: $275,000
 Future disability: $165,000

Mrs. Hoffman was awarded $15,000 and two of their minor children were awarded $10,000 for loss of consortium.
Sibley, SIM and Travelers Insurance Company appeal, claiming that the $440,000 general damage award and $400,000 for lost future income and fringe benefits are excessive. Liability is not contested.

GENERAL DAMAGES
Immediately after the accident, Hoffman felt pain in the back of his neck. He rested over the weekend and worked at a lighter job the following week. On February 1, 1988, nine days after the accident, Dr. John Toth diagnosed a cervical muscle strain. On February 3, 1988, Dr. Thomas Hall also found a cervical strain. Dr. Hall referred Hoffman to Dr. Walter Brent, Jr., an orthopedic surgeon.
Hoffman saw Dr. Brent on February 15, 1988 and complained of neck and shoulder pain and headaches. Dr. Brent's initial diagnosis was an acute cervical sprain, and he recommended physical therapy, prescribed muscle relaxers and anti-inflammatories, and suggested Hoffman refrain from heavy work. Hoffman's 44 physical therapy treatments over a four month period included moist heat, massages, intermittent cervical traction, and ultrasound. Physical therapy provided little relief. Hoffman saw Dr. Brent at regular intervals for several months because the pain continued. Eventually, an MRI was performed which revealed a ruptured disc at C5-6 and a bulging disc at C4-5. Dr. Brent suggested that Hoffman consult Dr. Amilca J. Correa for a neurological evaluation.
On June 28, 1988 Hoffman began seeing Dr. Correa, a neurological orthopedic surgeon, on a regular basis. Dr. Correa performed a physical examination which did not show nerve root entrapment. Dr. Correa admitted Hoffman to Humana Hospital to undergo a cervical mylogram and post-mylographic cervical CT scan. Hoffman remained hospitalized for six days due to severe headaches and nausea from the mylogram. The mylogram was negative; however, the CT scan showed a ruptured disc at C4-5 and a herniated disc at C5-6. The CT scan also revealed a bony spur at C5-6 and some closure of the foramina canal. Dr. Correa recommended conservative treatment including bed rest, medication, intermittent traction, continuing physical therapy, and no physical activities which required Hoffman to raise his arms above shoulder level. After 15 months of conservative treatment, including 51 additional physical therapy treatments, Hoffman still experienced neck, shoulder and arm pain plus episodes of tingling sensations in his upper extremities. Dr. Correa recommended removal of the disc and bone fusion surgery.
On May 31, 1989 Dr. Correa removed the C5-6 disc and Dr. Brent performed the bone graft for the fusion. The doctors explained that the fusion was done by taking bone from above Hoffman's hip and placing it in the spot where the disc was removed. Dr. Correa testified (videotape deposition) that "[i]t's like welding of the bones into each other." Both doctors related that the process places more pressure and stress on the discs immediately above and below the fused area and makes them prone to injury. Dr. Correa did not remove the damaged C4-5 disc because it was asymptomatic at the time of surgery. Hoffman remained in the hospital for nine days after surgery.
Dr. Correa saw Hoffman every six to eight weeks following surgery. X-rays taken by Dr. Correa about six months after *145 surgery showed a solid fusion and no graft displacement.
On April 2, 1990 Hoffman saw Dr. Brent and complained of pain radiating down the left upper extremity. Dr. Brent suggested that Hoffman see Dr. Correa and continue physical therapy. Dr. Brent also told Hoffman that if the problem persisted another MRI should be performed to determine whether the C4-5 disc had become symptomatic.
An MRI performed on April 17, 1990, at Dr. Correa's direction, confirmed his earlier x-ray findings. However, during an examination by Dr. Correa on April 28, 1990, Hoffman complained of numbness and a tingling sensation in the left scapula area. Dr. Correa explained that this was residual discomfort which is common among cervical disc surgery patients and may be permanent.
Dr. Correa testified that although the surgery was successful, Hoffman has reached maximum improvement and will have permanent lifting, pushing, pulling, and climbing restrictions. Dr. Correa assigned a 15-20% anatomical disability rating to Hoffman and Dr. Brent agreed. Dr. Correa anticipated discontinuing Hoffman's medication, physical therapy and post-operative care two to three months after trial.
Hoffman testified that the operation relieved a lot of pain and diminished the intensity and frequency of his headaches. However, at trial Hoffman was still experiencing pain across his left shoulder into his upper arm and numbness in his shoulder blade, and both problems appear to be worsening.
Hoffman was a 37-year-old married man with two sons, ages 5 and 8, when the accident occurred. Prior to the accident, he was a laborer at the Tenneco/Mobil Refinery for 17 years. He was active in the refinery's volunteer fire rescue squad and was a volunteer reserve deputy with the St. Tammany Sheriff's Office. He participated in archery, target shooting, bowled weekly with his wife, camping, water skiing and fishing at the family's camp. He cannot participate in any of those activities. His two older boys cry when they are told that he cannot play ball with them or put them on his shoulders at Mardi Gras parades. He baby-sits his one year old son (born after the accident) while his wife works, but he avoids picking up the baby. He no longer delivers flowers for his wife's floral business nor helps around the house. Hoffman lost his job and said that his self-esteem has deteriorated. Hoffman testified that his wife is now the "man of the house." Mrs. Hoffman testified that her husband is withdrawn, noncommunicative and unpleasant. She said that he is a "different person" since the accident.
An award for damages will not be disturbed on appeal absent an abuse of discretion. Our inquiry must focus on this plaintiff to determine whether he has received just compensation under his particular circumstances. Reck v. Stevens, 373 So.2d 498 (La.1979); Amedee v. Cruse, 526 So.2d 433 (La.App. 4th Cir.1988).
Hoffman's injuries produced a permanent anatomical disability and a likelihood of permanent residual discomfort. His active lifestyle and relationships with his wife and sons were severely impacted. There is no contradictory medical or lay evidence. When individualizing the award to Hoffman for the consequences of this accident, we find that $440,000 for past and future pain, suffering and mental anguish, and future disability is within the upper limits of the jury's much discretion.

LOST FUTURE INCOME AND FRINGE BENEFITS
The defendants contend that $400,000 for lost future income and fringe benefits is excessive. They argue that Hoffman failed to establish that his injuries would limit his ability to earn similar wages and fringe benefits in the future and that he did not introduce evidence regarding his future vocational status.
Hoffman testified that he earned 76 credit hours, primarily in music, from the University of New Orleans. He withdrew from college when he was 21 or 22 years old to avoid failing. He worked as a security guard for a few months and briefly as a *146 manual laborer at a sugar refinery. Hoffman began working at the Tenneco/Mobil Refinery as a laborer when he was 23 years old. Hoffman lost his job as a result of his accident-related injuries.
Hoffman said that he is anxious to return to work. He applied for a position as a patrolman with the Mandeville Police Department which pays approximately $14,000 per year. He passed the department's oral test but is uncertain whether he can pass the physical test. Hoffman is currently a volunteer reserve detective doing paperwork and some patrol duty for the St. Tammany Sheriff's Office. He would earn $12,000 per year if hired as a deputy in St. Tammany. Hoffman was offered an auto parts delivery job which paid minimum wage.
Dr. Correa confirmed Hoffman's ability to return to work and recommended vocational rehabilitation training. Both Dr. Correa and Dr. Brent consider Hoffman capable of performing a job which (unlike his former position) does not require climbing, heavy or repetitive lifting, pushing, or pulling.
Dr. Melville Z. Wolfson, a forensic economist called by the plaintiff, calculated Hoffman's future earnings loss assuming a work life expectancy of 20.4 years, until age 60, and a life expectancy of 35 years, until age 75. To calculate Hoffman's post-accident wage base, Dr. Wolfson increased Hoffman's 1988 earnings of $38,031 to $42,104 to reflect the 150 hours overtime and 50 cents per hour shift differential lost by Hoffman that year due to the accident. Dr. Wolfson increased the 1988 wage base rate of $42,104 to $43,386 for 1989 to reflect a 50 cent raise guaranteed by Hoffman's union contract. The same increase was used to calculate Hoffman's projected 1990 post-accident wage base of $45,582. Dr. Wolfson factored in inflation and made adjustments to his calculations for taxes and to account for periods during which Hoffman may be unemployed. Using a 7½% discount rate, Dr. Wolfson estimated that Hoffman's future loss of income would be $734,000 if he could not work. If Hoffman earned $12,000 per year as a St. Tammany deputy, Dr. Wolfson said Hoffman's future lost earnings would be $522,367. No figure was given using the Mandeville Police Department patrolman's salary of $14,000 per year, the only position for which Hoffman applied.
Dr. Wolfson testified that an additional $120,000 would be required to compensate Hoffman for his loss of "generous" fringe benefits. Those benefits included four weeks of paid vacation per year, a $271 monthly employer contribution to his family medical and hospitalization coverage, a $15.50 monthly employer contribution to Hoffman's family dental coverage, an employer contribution of 6% of Hoffman's base pay to his savings plan in which Hoffman is vested, a $15,000 employer contribution to Hoffman's life insurance plan, and participation in the company's retirement plan.
Dan M. Cliffe, a certified public accountant, testified for the defendants as an economic loss projectionist. Cliffe used 1988 earnings of $38,031 (Hoffman's tax return) as a base to calculate future lost earnings. Cliffe assumed Hoffman could earn a beginning salary of $25,000 with annual increases of at least 4%. He factored in inflation and an 8.75% discount rate and concluded that Hoffman's future earnings loss would be $51,567. Cliffe said that Hoffman would not lose fringe benefits if he were employed in a position which paid $25,000 to $40,000 per year; consequently, no calculations were made for such a loss. On cross-examination, Cliffe stated that the wage base he used did not include overtime, a 50 cents per hour shift differential, or the annual salary increases mandated by Hoffman's union contract.
Marion Chapman testified for defendants as a vocational rehabilitation expert. Based on her review of depositions by Hoffman, Dr. Correa and the Mobil Employee Relations Manager, she felt that Hoffman was qualified to be a salesman. She stated that she investigated the sales area "because of the amount of income that is involved with that, which is in the higher salary bracket." Chapman located job openings as a salesman with five auto *147 dealerships, an answering service company, and a cable television company. The jobs had starting salaries between $20,000 and $30,000 plus various benefits.
On cross-examination, Chapman said that she did not give Hoffman an aptitude test to determine whether he was suited to be a salesman. She explained that the aptitude of a sales person includes the desire to succeed and the ability to talk to people. Chapman reasoned that Hoffman's six semesters of college and his experience delivering flowers evidenced Hoffman's ability to communicate with people and an aptitude to sell.
Hoffman did not utilize a rehabilitation expert.
Hoffman testified that he was willing to try anything to support his family, but he thought that he would not be a good salesman because he has difficulty talking to others.
Lost future income and fringe benefits awards are inherently speculative. Lost future income awards include calculating the difference between the plaintiff's actual earnings before and after a disabling accident and evaluating the difference between earning capacity before and after the accident. One of the factors to consider is the availability of employment opportunities which are consistent with the plaintiff's nature, training and experience. Other factors to evaluate include the plaintiff's pre-accident physical condition, work history, prior earnings and the likelihood of earning a similar amount absent the injury. Bernard v. Royal Insurance Co., 586 So.2d 607 (La.App. 4th Cir.1991); see also Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Considering Hoffman's 17 year work history as a laborer and 5 year volunteer involvement in law enforcement, the jury could have reasonably concluded that it was unrealistic to accept the defendants' argument that Hoffman could become a salesman earning $25,000 to $40,000 per year and only lose $51,567 of future income. Apparently, the jury rejected Dr. Wolfson's lowest calculation of $642,367 which limited Hoffman's future earnings to $12,000 per year without fringe benefits.
After considering all factors in evidence, we conclude that $400,000 for lost future income and fringe benefits was not an abuse of the jury's much discretion.
The judgment is affirmed.
AFFIRMED.